[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-12338
_____

D.C. Docket No. 2:65-cv-00396-MHH

LINDA STOUT,
by her father and next friend, Blevin Stout,
CATRENA CARTER,
LONNELL CARTER,
ALFORNIA CARTER,
SANDRA RAY,
RICKY REEVES,
ALENE REEVES,

Plaintiffs-Appellants/Cross-Appellees,

UNITED STATES OF AMERICA, et al.,

Intervenor Plaintiffs,

versus

JEFFERSON COUNTY BOARD OF EDUCATION,

Defendant-Appellee,

GARDENDALE CITY BOARD OF EDUCATION,

Defendant-Appellee/Cross-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Alabama
_____

(February 13, 2018)

Before WILLIAM PRYOR, JILL PRYOR, and CLEVENGER,[*] Circuit Judges.

WILLIAM PRYOR, Circuit Judge:

This appeal requires that we revisit the decades-old task of school desegregation. A racial desegregation order issued in 1971 still governs the Jefferson County Board of Education in Alabama. But beginning in 2012, residents of the City of Gardendale, a predominantly white community in Jefferson County, sought to create a separate, municipal school system. Leaders of a grassroots movement used social media to discuss the changing racial demographics of their schools as they campaigned for the creation of a city school board and new taxes to support the proposed school system. In 2015, the newly created Gardendale City Board of Education moved the district court to permit it to operate a municipal school system, but black schoolchildren opposed the motion. The district court found that the Gardendale Board acted with a discriminatory purpose to exclude black children from the proposed school system and, alternatively, that the secession of the Gardendale Board would impede the efforts of the Jefferson

_____

[*] Honorable Raymond C. Clevenger III, United States Circuit Judge for the Federal Circuit, sitting by designation.

2

County Board to fulfill its desegregation obligations. Despite these findings, the district court devised and permitted a partial secession that neither party requested. We conclude that the district court committed no clear error in its findings of a discriminatory purpose and of impeding the desegregation of the Jefferson County schools, but that it abused its discretion when it *sua sponte* allowed a partial secession. We affirm in part, reverse in part, and remand with instructions to deny the motion to secede.

## I. BACKGROUND

We divide our discussion of the background of this appeal in three parts. First, we discuss the early history of this litigation. Second, we discuss the evolution of the Gardendale secession movement. Third, we discuss the motion filed by the Gardendale Board and the order entered by the district court.

### A. *The Early History of this Litigation*

In 1965, Linda Stout's father sued the Jefferson County Board of Education on behalf of her and a class of black schoolchildren for "operating a compulsory biracial school system" eleven years after the Supreme Court ruled in *Brown v. Board of Education* (*Brown I*), 347 U.S. 483, 495 (1954), that "[s]eparate educational facilities are inherently unequal" and deprive black children "of the equal protection of the laws guaranteed by the Fourteenth Amendment." The district court ordered the Jefferson County Board of Education to devise a plan to

3

begin desegregating its schools in the 1965–66 academic year. And the United States intervened as a plaintiff.

Dilatory tactics and half-hearted efforts slowed the pace of desegregation. *See, e.g.*, *United States v. Jefferson Cty. Bd. of Educ.*, 372 F.2d 836, 878 (5th Cir. 1966) (Wisdom, J.) (explaining that school-board plans had "little prospect of . . . ever undoing past discrimination or of coming close to the goal of equal educational opportunities"), *aff'd en banc*, 380 F.2d 385 (5th Cir. 1967); *see also, e.g.*, *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 13 (1971) (discussing the "[d]eliberate resistance of some to the [Supreme] Court's mandates"). By 1969, black children in Jefferson County had yet to realize the full promise of *Brown I*. Spurred by the mandate to "terminate dual school systems at once," *Alexander v. Holmes Cty. Bd. of Educ.*, 396 U.S. 19, 20 (1969), our predecessor circuit consolidated this case with twelve other desegregation cases and directed the district courts to require the immediate merger of "faculties and staff, transportation, services, athletics and other extracurricular activities" as well as the merger of "student bodies," *Singleton v. Jackson Mun. Separate Sch. Dist.*, 419 F.2d 1211, 1217 (5th Cir. 1969) (en banc). In 1970, the district court entered a comprehensive desegregation order.

After four predominantly white cities—Pleasant Grove, Vestavia Hills, Homewood, and Midfield—withdrew from the Jefferson County school system

and formed municipal school districts, our predecessor circuit directed the district court to "require the school board forthwith to implement a student assignment plan" that "encompasses the entire Jefferson County School District as it stood at the time of the original filing of this desegregation suit." *Stout v. Jefferson Cty. Bd. of Educ.* (*Stout I*), 448 F.2d 403, 404 (5th Cir. 1971) (footnote omitted). It declared that "where the formulation of splinter school districts, albeit validly created under state law, have the effect of thwarting the implementation of a unitary school system, the district court may not . . . recognize their creation." *Id.* (footnote and citation omitted). And it directed the district court to "implement fully" its desegregation order. *Id.*

In 1971, the district court issued the desegregation order that still governs the operations of the Jefferson County school system. The 1971 order established school attendance zones, including the Gardendale attendance zone, and comprehensive policies for student assignments, school construction, and the transfer of students between attendance zones. The order included a provision that permits some students to transfer from schools in which their race is in the majority to schools in which their race is in the minority. And it provided that Jefferson County must pay municipal school systems that educate students from unincorporated areas of the County the ad valorem school taxes collected from those areas. The order also established several requirements for municipal systems

5

to secede, including a requirement that a municipal system "make sufficient space available for black students from the county system" so that black student enrollment in a municipal system equals at least one-third of the white student enrollment in the new system.

In 1972, the Supreme Court ruled in *Wright v. Council of the City of Emporia* that "a new school district may not be created where its effect would be to impede the process of dismantling a dual system." 407 U.S. 451, 470 (1972). The Court explained that the inquiry into whether a splinter district should be permitted to secede depends on its effect, even if the splinter district has a benign motive: "The existence of a permissible purpose cannot sustain an action that has an impermissible effect." *Id.* at 462. And in *Ross v. Houston Independent School District* (*Ross II*), our predecessor circuit made clear that "the proponents of the new district must bear a heavy burden to show the lack of deleterious effects on desegregation." 583 F.2d 712, 714 (5th Cir. 1978). Only if they satisfy that "heavy burden" may a district court permit secession. *Id.*

When the Pleasant Grove Board of Education refused to comply with the 1971 order and "accept its role" in the desegregation of the Jefferson County school system, our predecessor circuit affirmed an order that the Jefferson County Board "take up the operation of the Pleasant Grove district schools." *Stout v. Jefferson Cty. Bd. of Educ.* (*Stout II*), 466 F.2d 1213, 1214 (5th Cir. 1972). The

6

Fifth Circuit stressed that "[s]overeignty should be returned" to the Pleasant Grove Board only after it "demonstrates to the district court's satisfaction by clear and convincing evidence that it is able and intends to comply with the court's orders concerning its role in the desegregation of the Jefferson County School District." *Id.* at 1215. To this day, the Pleasant Grove Board has never satisfied that burden.

In 1976, our predecessor circuit acknowledged that Jefferson County had made "great progress" toward desegregation, but the circuit court cautioned that federal supervision was still required. *Stout v. Jefferson Cty. Bd. of Educ.* (*Stout III*), 537 F.2d 800, 801 (5th Cir. 1976). The circuit court affirmed a refusal to require busing between two predominantly white and black school zones as dangerous and infeasible. *Id.* And it stated that "the former dual school system has been effectively dismantled and a unitary system substituted." *Id.* at 802. Even so, it determined that the school system still "must continue under the scrutiny and surveillance of the district court," and it directed that the district court consider "broadening and making more attractive its existing majority-to-minority transfer procedures and . . . strengthening the curriculum to magnet levels in [two] facilities." *Id.* at 803.

Predominantly white municipalities continued to secede and slowly, but significantly, change the demographic makeup of the Jefferson County schools. Since the dissolution of the Pleasant Grove school system, three other

7

predominantly white municipalities—Hoover, Trussville, and Leeds—seceded from the Jefferson County school system. And some municipalities later annexed predominantly white communities in the County. In 2003, for example, the City of Vestavia Hills annexed the Cahaba Heights community, the population of which was about 95 percent white as of 2010. And the secession of Trussville and Leeds alone led to about a 3 percentage point decrease in the white population and a 3 percentage point increase in the black population in the Jefferson County school system.

The cumulative impact of these municipal secessions and suburban growth has been dramatic. In 2000, the student population in the Jefferson County school system was about 75 percent white and 23 percent black. But by 2015, the student population of the school system was approximately 43 percent white and 47 percent black.

### B. The Evolution of the Gardendale Secession Movement

The Gardendale secession movement started when the schools in that City were becoming racially diverse while the population of the City remained overwhelmingly white. In 1996, the student population in Gardendale was 92 percent white and 8 percent black. The current population of the City has a similar demographic makeup. As of 2010, more than 88 percent of the population was white and less than 9 percent was black. But by 2010, only one of the four public

schools in Gardendale, Snow Rogers Elementary School, came close to mirroring the racial demographics of the City. In 2010, Snow Rogers Elementary was about 94 percent white and 4 percent black. The other three schools in Gardendale—Gardendale Elementary, Bragg Middle School, and Gardendale High School—were less than 80 percent white and 20 or more percent black. Gardendale Elementary was about 75 percent white and 20 percent black; Bragg Middle was about 77 percent white and 21 percent black; and Gardendale High was about 75 percent white and 23 percent black. And in later years, the schools continued to become more racially diverse in even starker contrast with the demographics of the City. Snow Rogers Elementary had a student population that was about 85 percent white and 5 percent black during the 2015–16 academic year. Gardendale Elementary was about 71 percent white and 24 percent black. Bragg Middle was about 67 percent white and 29 percent black. And Gardendale High was about 71 percent white and 27 percent black.

The racial diversity of the schools in Gardendale stems from the attendance of students who reside outside its municipal limits. Students from the predominantly black community of North Smithfield/Greenleaf Heights constitute nearly 30 percent of the black student population at Bragg Middle and more than 25 percent of the black student population at Gardendale High. Students from the unincorporated and predominantly white community of Mount Olive as well as

9

students from the more integrated Town of Brookside and City of Graysville also attend the middle and high schools in Gardendale. Dozens of black students have taken advantage of the majority-to-minority transfer provision in the 1971 order to attend schools in Gardendale. For example, from 2009 to 2016, anywhere from 12 to 22 black students attended Gardendale High annually as transfer students. After the No Child Left Behind Act of 2001, 20 U.S.C. §§ 6301 *et seq.*, required public school boards to permit students attending schools "identified for school improvement" to transfer to schools not so identified, 20 U.S.C. § 6316 (repealed 2015), the district court also amended the 1971 order to permit some black students from less successful schools to transfer to Snow Rogers Elementary and Bragg Middle. Because of capacity issues, the district court permitted only 12 students to transfer to Bragg Middle for each of the relevant years. In sum, Gardendale schools are racially diverse institutions in an otherwise white enclave in large part because zoning and desegregation transfer opportunities permit other Jefferson County students to attend the schools.

Against this backdrop, four individuals, Tim Bagwell, Chris Lucas, David Salters, and Chris Segroves, launched a campaign to create a municipal school system for Gardendale. Segroves later became the president of the Gardendale Board. Lucas became a member of the Board. And Bagwell and Salters served on an advisory board.

10

As part of their campaign, Bagwell, Lucas, and Salters created and maintained a Facebook page titled "Gardendale City Schools." The page was publicly accessible, but the secession leaders served as page administrators with the ability to approve new members, delete posts, and change the privacy settings.

From the start, the secession leaders expressed concern about the changing demographics of the Gardendale schools. Salters explained in one post that the population of the predominantly white City of Gardendale looked different from the more diverse student population at the Gardendale schools: "A look around at our community sporting events, our churches are great snapshots of our community. A look into our schools, and you'll see something totally different." Bagwell alluded to those demographic differences when he listed among the benefits of a municipal system, "better control over the geographic composition of the student body [and] protection against the actions of other jurisdictions that might not be in our best interests."

The secession leaders argued that a separate school system would give the residents of Gardendale greater control over their children's education, improve the academic quality of the schools, and permit Gardendale "to control [its] own revenue stream." But the secession leaders never met with representatives of the Jefferson County Board to discuss their grievances, and they struggled to identify specific deficiencies in the County schools. Segroves testified that he "had no

11

involvement in the schools in Jefferson County prior to . . . serving on the [Gardendale] [B]oard." When asked to identify "specific changes that [he] would make if [Gardendale] were allowed to separate," Salters replied, "Just overall improvements, general improvements of education which are reflected in the size of the school system." And Bagwell stated that "at least historically in many areas, including Alabama, a smaller system with individual local control, historically they tend to perform better academically than larger systems." He added that a municipal school system "seems to be a component for a vital community with higher-than-average growth and desirability."

The secession leaders and others frequently blamed "non-residents," particularly students from the predominantly black community of North Smithfield, for allegedly draining resources from the Gardendale schools. In response to a suggestion that racial concerns were animating the movement, Salters stated in a Facebook post that "non-resident students are increasing at a [sic] alarming rate in our schools." "They consume the resources of our schools, our teachers and our resident students, then go home" without "contribut[ing] financially." He stated that he would "welcome those students," but only if they "move to Gardendale or pay a transfer fee." One online participant put it more bluntly: "[D]id you know we are sending school buses to Center point [sic] and busing kids to OUR schools in Gardendale, as well as from Smithville!" That

12

participant stated that some of the transfer students "have been bused here for years due to the desegregation from decades ago and that should have already been changed because we have a very diverse population now in our area." The participant said, "We are busting at the seams and can't continue on this path!" Salters expressed similar concerns: "We are using buses to transport non-residents into our schools (without additional funding) from as far away as Center Point (there's your redistribution of wealth)."

Secession supporters frequently derided the City of Center Point, a predominantly black community that used to be a predominantly white community and has no municipal school system. In 1970, Center Point was over 99 percent white, but by 2010, about 33 percent of Center Point was white and 63 percent was black. When comparing Gardendale to Center Point, secession leaders warned residents that if they failed to act, Gardendale would follow a similar trajectory. For example, at a public meeting, Salters stated, "It likely will not turn out well for Gardendale if we don't do this. We don't want to become what" Center Point has become. And an online participant asked, "[W]ould you like to live in Center Point or Adamsville?" She "encourage[d] [another online participant] to ride around those areas, maybe even Pinson or Huffman and think about how quickly an area's demographics change." She added, "This is about a community wanting to progress, not regress."

13

In contrast with their comments about Center Point, the secession leaders touted the predominantly white community of Mount Olive as a desirable area to be included in the new school system. In a post on Facebook, Lucas contrasted the intended treatment of Mount Olive with that of "minorities." In response to a question about the impact of "[f]ederal desegregation laws" on the proposed secession, he explained that minorities not residing in Gardendale would not be students in the new system, but that Gardendale might annex Mount Olive:

> 1) Will kids in North Gardendale (who may currently be zoned for county schools in Morris) be zoned for a city school system? Yes. All kids within the municipal boundaries of Gardendale would go to schools within the new system.
>
> 2) Would Gardendale be required to bring in minorities from outside of the municipal boundaries to achieve some sort of quota? No. The school system is for residents of Gardendale (whatever those boundaries end up being and whatever that racial make-up is). The idea is that it might include an expansion to include an annexation of certain parts of Mount Olive.

Indeed, the secession leaders and others regularly discussed the status of Mount Olive, though practical obstacles related to the local fire district ultimately thwarted their intended plans.

Eventually, the secession leaders "began having conversations with the mayor . . . and the council . . ., and [they] got their backing because any kind of official actions would obviously have to occur through the city, and then the city commission." Lucas explained that "[a]t the end of the day, [city officials have] got

14

to drive the official efforts, but it really became a ground swell of a movement and that was how the whole idea was born." According to Lucas, he and Salters "put the mayor and the council in a head lock until they came to their own conclusions that the school system had to happen."

In October 2012, the Gardendale City Council commissioned Dr. Ira Harvey to study the feasibility of a Gardendale school system. Harvey concluded that the secession was possible based on estimates that included students from predominantly white Mount Olive but did not include students from predominantly black North Smithfield. Harvey's conclusion stemmed, in large part, from his determination that the municipal school system would acquire debt-free the $51 million Gardendale high-school facility, which though located in the City of Gardendale was financed and constructed by Jefferson County. The siting of the school was proposed by the Jefferson County Board to the plaintiffs and the United States, and the parties agreed that the high school would serve as a regional educational facility with a career technical program to foster voluntary desegregation by encouraging high-school students to enroll in programs outside of their zoned schools. According to the Jefferson County superintendent, Dr. Warren Pouncey, the high school currently serves students who reside in about five different high school zones.

15

While Harvey was performing the feasibility study, the secession leaders formed a nonprofit entity called Future of Our Community Utilizing Schools (FOCUS) Gardendale. FOCUS Gardendale existed to raise funds and to lobby for higher property taxes to support the proposed school system. FOCUS Gardendale circulated a flyer that depicted a white elementary-school student and asked, "Which path will Gardendale choose?" It then listed several well-integrated or predominantly black cities that had not formed municipal systems followed by a list of predominantly white cities that had. The flyer described the predominantly white communities as "some of the best places to live in the country."



**Which path will Gardendale choose?**

Places that chose NOT to form and support their own school system:
- ✓ Adamsville/Forestdale
- ✓ Hueytown
- ✓ Pleasant Grove
- ✓ Center Point/Huffman

Communities that chose to form and support their own school system, and are listed as some of the best places to live in the country:
- ✓ Homewood
- ✓ Hoover
- ✓ Vestavia
- ✓ Trussville

**On which list will you place Gardendale?**

The campaign by the secession leaders succeeded. In September 2013, the City Council approved a five-mill ad valorem tax, and the citizens of Gardendale

16

later voted on a referendum to impose an additional five-mill tax to fund the school system. In 2014, the Council adopted an ordinance that "established a public school system for the City of Gardendale, Alabama, to be known as the Gardendale City School System." Gardendale, Ala., Code § 14-1 (2014). The ordinance also created a Board of Education and vested it with the "power, authority and dut[y]" to, among other things, "maintain and do all things necessary and proper for the management of the Gardendale City School System." *Id.* § 14-4. That same year, the Council appointed the first members of the Gardendale Board, which, under state law, could include only Gardendale residents. *See* Ala. Code § 16-11-2(b). Although the Council received applications from black residents of Gardendale, the five members selected were all white.

The Gardendale Board immediately hired Dr. Patrick Martin to serve as superintendent. Martin had no prior experience operating under a desegregation order, none of the school districts where he has previously worked was more than 15 percent black, and over his 17-year career as an administrator and educator, he has never hired a black teacher, worked with a black teacher, or hired a black administrator. When he sent the Gardendale Board an email update to help it "understand the lens through which the Plaintiff Parties may view [the] [s]eparation," he quoted a book he was reading that compared the income distribution of black people in 1970 and today. He stated that about the same

17

percentage of black people live in poverty today and that, according to the book, "[m]uch of the progress that was the source of such optimism a generation ago has been lost in the current generation."

Superintendent Martin drafted a secession plan in the fall of 2014. An early plan provided that all of the non-resident students who currently attend the four schools in Gardendale, including students from North Smithfield and other surrounding areas, would be phased out of the Gardendale municipal system over a period of 13 years. Superintendent Martin's plan permitted racial desegregation transfer students to attend the Gardendale schools, but it conditioned transfer opportunities on space availability, tuition payments by means other than personal check, annual reapplications for transfer, and a stipulation that the Gardendale Board would not provide transportation to transfer students. Afterward, Segroves, as president of the Gardendale Board, questioned the need for racial desegregation transfers. On a redline version of the plan, he wrote, "Legal team to review and confirm its applicability/appropriateness for GBOE [Gardendale Board of Education]" next to the racial desegregation provision.

Although the Gardendale Board never formally approved any plan, it submitted a plan to the district court in December 2015 in support of its motion to secede. Like the earlier one, the plan submitted to the district court proposed redrawing the school attendance lines at the municipal boundaries of Gardendale

18

and eliminating, over the course of a 13-year transition period, many of the non-resident students from the Gardendale schools. But the plan eliminated entirely the racial desegregation transfer provision.

The plan provided that North Smithfield students in kindergarten through twelfth grade "shall attend the Gardendale Schools on the same basis as Gardendale Students, provided that the County Board or the tax collector for Jefferson County shall pay to the City Board the ad valorem school taxes collected from the North Smithfield Manor and Greenleaf Heights communities." The plan provided no transition period for these students. The Gardendale Board vaguely alleged in its motion to secede that "North Smithfield Manor and Greenleaf Heights students will be able to attend Gardendale Schools for the indefinite future." But the Gardendale Board did not consult with the parents of North Smithfield students before adding this provision. In fact, Superintendent Martin declined an invitation to attend North Smithfield Community Civic League meetings to discuss the proposed secession. And although Martin testified that he added the provision, in part, because of "the importance of educational continuity," he also testified that the change was motivated by a desire to "honor the [desegregation] order."

Some supporters of secession expressed their displeasure at the prospect of allowing any non-residents to attend the municipal schools. Bagwell defended on

19

Facebook permitting the attendance of North Smithfield students as "a specific, technical, tactical decision aimed at addressing a recognized road block to breaking away." And he later described that "bitter . . . pill" as something that weighed against the "ultimate . . . goal" of secession:

> You and I may not think that it is particularly fair to accept an out-of-district area not subject to our control or taxation as a price to pay to gain approval for separation, and we would be within reason to feel that way. The extent to which fair has anything to do with it depends on how you weigh your priorities in deciding whether it is too bitter a pill to swallow or if the ultimate treatment goal, i.e. separation, is worth it.

### C. The Proceedings in the District Court

On March 13, 2015, the Gardendale Board moved to intervene in this action. Although counsel for the Gardendale Board represented that he understood that "every aspect of [the] operation [of the proposed school system] would have to be submitted to the [district] [c]ourt for review," the Gardendale Board also filed a complaint in state court requesting that the state court direct the Jefferson County Board to relinquish control of the Gardendale schools. The district court later enjoined the state lawsuit. On December 11, 2015, the Gardendale Board filed a motion to operate a municipal school system and attached the 2015 proposed secession plan. Black children who currently attend Jefferson County schools were substituted as plaintiffs in the action and opposed the secession. And the City of Graysville, the Town of Brookside, and two parents from Mount Olive moved for limited intervention to oppose the secession.

20

The Gardendale Board sought immediate review of its motion to secede even though the district court was in the process of determining whether judicial supervision of Jefferson County continued to be necessary. Counsel for Gardendale stated, "[I]t is [not] necessary for the [district] [c]ourt to decide whether or not the county has, in fact, achieved full unitary status for the [district] [c]ourt to be able to rule on [the] motion to be allowed to separate." And about a year later, Superintendent Martin joined representatives of the Department of Justice and others for a tour of the schools in the Jefferson County system. After the site visit, Martin opined in a "Weekly Board Update" to members of the Gardendale Board that "if Jefferson County really does aim to gain Unitary Status there is going to be an excessive amount of work to be done across the entirety of the county and . . . we need to do everything to make sure we are not lumped into that process."

When the district court ruled on the motion by the Gardendale Board to operate a municipal school system, the district court made two findings of fact. First, it found that the Gardendale Board violated the Equal Protection Clause of the Fourteenth Amendment because "race was a motivating factor in Gardendale's decision to separate from the Jefferson County public school system." Second, it found that "Gardendale ha[d] not established that its separation will not impede Jefferson County's effort to obtain a court order dissolving the . . . desegregation

21

order." But the district court then *sua sponte* invoked its equitable authority to craft a new secession plan based on "a number of practical considerations."

The district court found that the supporters of secession from the outset acted with a racially discriminatory purpose. It found that "some Gardendale citizens are concerned because the racial demographics in Gardendale are shifting, and they worry that Gardendale, like its neighbor Center Point, may become a predominantly black city." The district court found that they "prefer a predominantly white city" and support a municipal school system because it would allow them to eliminate non-resident black students from the Gardendale schools. The district court found that concerns about the "geographic composition" of the student bodies in the Gardendale schools could be traced to the 1971 desegregation order, which created a Gardendale attendance zone that includes North Smithfield and provides for desegregation transfer opportunities. The district court found that the secession leaders preferred that the Gardendale schools serve only the predominantly white students that reside in Gardendale and Mount Olive. The district court also explained that although at least one Facebook comment ostensibly blamed the No Child Left Behind Act for capacity and other issues at the Gardendale schools, most of the transfer students attending the Gardendale schools were desegregation transfer students. So the children "who look 'totally different' from the children who attend churches in Gardendale or play on ball

22

fields there are students from the North Smithfield community . . . and transfer students from areas like Center Point who attend Gardendale schools pursuant to the . . . desegregation order."

The district court found that the secession leaders recognized that if they wanted to "maintain the geographic integrity of the Gardendale zone," they had to "translate their grassroots effort into official action." Different versions of the secession plan imposed conditions that the district court "reasonably infer[red]" were "designed to minimize or eliminate racial desegregation transfers." The plan attached to the motion to secede would have eliminated all racial desegregation transfer students. Earlier drafts conditioned transfer opportunities on space availability, which would effectively eliminate Gardendale Elementary and Bragg Middle as potential transferee schools. And the last plan submitted to the district court provided that transfer opportunities would be provided "subject to space availability" and that transportation would not be provided "unless required by federal courts."

The district court explained that none of these plans had been approved by the Gardendale Board and that Superintendent Martin was "unable to say which, if any, of his draft transfer policies the Gardendale Board ultimately would be willing to implement." The district court found that "[t]his official action—or lack thereof—dovetails with the separation organizers' expressed interest in eliminating

23

from the [Gardendale] schools . . . students who are bussed into Gardendale from other areas of Jefferson County."

The district court found that the treatment of the North Smithfield students in the various draft plans suggested that the Gardendale Board would permit those students to attend Gardendale schools only if required by a federal-court order. Even though North Smithfield students have attended the Gardendale schools since 1971, the Gardendale Board sought to exclude them entirely in an early draft of the secession plan. The Gardendale Board "recalculated after it realized that the elimination of the North Smithfield students might jeopardize the separation effort." And comments referring to the change in the December 2015 plan as a "specific, technical, tactical decision aimed at addressing a recognized road block to breaking away" confirmed the motivation behind that decision.

The district court also found that the Gardendale Board had not voted on a plan because it "ha[d] been waiting to see whether its attorneys could persuade the [district] [c]ourt that the 1971 desegregation order does not govern Gardendale's separation." If the district court ruled that the order no longer governs municipal secessions, then the Gardendale Board would not need to ensure any racial diversity in its schools. And even if the district court ruled that the order still governs secessions, the Gardendale Board would condition the attendance of North Smithfield students on the remittance of ad valorem tax dollars from Jefferson

County because the desegregation order provides the "mechanism that makes those tax dollars flow to Gardendale." So if the desegregation order were dissolved in the future, the North Smithfield students "would have no assurance that [the Gardendale Board] would allow them to continue to attend Gardendale schools." In other words, even though the secession leaders originally planned to permit students from Mount Olive, a predominantly white community, to attend the Gardendale schools, the Gardendale Board refused to "ma[k]e a meaningful, binding commitment to the children in North Smithfield." The district court found that "the Gardendale Board is trying to evade the [district] [c]ourt's desegregation order because some citizens in Gardendale want to eliminate from Gardendale schools the black students whom Jefferson County transports to schools in Gardendale."

The district court rejected the argument of the Gardendale Board that our predecessor circuit ruled that Jefferson County had achieved unitary status in *Stout III*. It explained that *Stout III* used the term "unitary" to describe student assignments in Jefferson County, not the status of its desegregation efforts. And it rejected the argument that "desegregation orders are outmoded" because "age alone does not render the [1971] order unenforceable." It also explained that it "reasonably infer[red] from Gardendale's litigation strategy and from the Superintendent's statement that Jefferson County has to do 'an excessive amount

25

of work' to fulfill the obligations of the desegregation order that Gardendale does not genuinely believe that Jefferson County currently is eligible for a release from federal supervision." But although the district court determined that the 1971 order was still in effect, it ruled that the "one-third requirement" that prompted the inclusion of North Smithfield in the secession plan was unenforceable under current law because it involved an unlawful racial quota.

The district court found that the secession of Gardendale would impede the desegregation efforts of the Jefferson County Board in three ways. First, it considered the "post-separation racial demographics." It acknowledged that "[b]y Gardendale's numbers, the municipal system will be more desegregated at the conclusion of the [transition] period" because the Gardendale Board will "phase out more white students than black students." But it found that the transition period "makes the ultimate racial composition of the Gardendale district difficult to forecast because so much may change over 13 years." The district court found that a new school system would likely have a higher percentage of white students than the statistics offered by the Gardendale Board suggest because predominantly white communities likely would be annexed by Gardendale. The district court also acknowledged that the impact on the Jefferson County school system "may seem insignificant at first blush." It found that if Gardendale seceded and the new school system included only Gardendale students, the overall student population in the

26

Jefferson County school system would become 1.8 percent more black. And if North Smithfield students were zoned for the Gardendale schools, the Jefferson County student population would become 1.5 percent more black. But it underscored the "cumulative impact of municipal separations and annexations on Jefferson County's ability to fulfill its obligations under the desegregation order." It found that the "series of municipal separations in Jefferson County has repeatedly shifted the geographic, demographic, and economic characteristics of the Jefferson County district, making it difficult" for the Jefferson County Board to comply with the desegregation order and for the district court to evaluate its compliance. And it found that the "[t]he direct impact of the separation" would be to force displaced students to attend more segregated schools. The district court stressed that middle and high school students, in particular, would be forced to attend schools that are between 85 percent and 99 percent white or black.

Second, the district court underscored the importance of Gardendale High to the desegregation efforts of the Jefferson County Board, and it found that its loss would cause the Jefferson County Board to have fewer funds to invest in other facilities and programming. It explained that the Jefferson County Board invested in the magnet program in the high school and located it in Gardendale to encourage voluntary desegregation and satisfy its obligations under the 1971 order. If the Jefferson County Board were to forfeit the high school facility, it would lose the

27

use of this important "desegregatory tool[]." And the district court added that the other schools in Gardendale have also "played an important role in Jefferson County's desegregation efforts" because their location makes it "relatively convenient" for black students to take advantage of desegregation transfer opportunities. If desegregation transfer students could no longer attend those schools, black students might be less willing to transfer at all.

Third, the district court explained that the words and actions of the secession leaders and the Gardendale Board "communicated messages of inferiority and exclusion" to black schoolchildren. It quoted the "belittling language of exclusion" on the public Facebook page. It described the FOCUS Gardendale flyer that "ask[ed] Gardendale voters if they would rather live in an affluent white city or a formerly white city that now is well-integrated or predominantly black." And it explained that the Gardendale Board not only failed to disavow those messages of inferiority but instead reinforced them. The Gardendale superintendent never conferred with the parents of North Smithfield students even though he was in regular communication with Gardendale residents; he ignored reports that Gardendale residents were upset that North Smithfield students would be allowed to attend the Gardendale schools; and the Gardendale Board never voted on any plan that would give North Smithfield students some meaningful assurance that they could continue to attend the Gardendale schools. The district court found that

28

"[t]he messages of inferiority in the record in this case assail the dignity of black school children."

Despite finding that the Gardendale Board sought to secede for racially discriminatory reasons and that the secession would impede the desegregation efforts of the Jefferson County Board, the district court *sua sponte* devised and permitted a partial secession that effectively amended the 1971 desegregation order, and it listed four "practical considerations" to support its decision. First, it explained that if it prohibited the secession, Gardendale families and students "may blame students from North Smithfield for Gardendale's inability to operate a municipal system." Second, it explained that it had to consider the interests of the students and parents in other parts of Jefferson County, and it stated that it "would be reluctant to [release Jefferson County from federal supervision] if the Gardendale zone remains in the Jefferson County district, given the evidence of racial motivation in this case." In contrast, permitting the secession would allow the district court to "tailor supervision to the particular needs of the county district and the municipal district." Third, it stated that it "must, to the extent practicable, honor the wishes of parents who support a local system simply because they want greater control over their children's education." And fourth, it noted that it "may consider the interests of" students from Mount Olive and the other communities that would be directly affected by the secession.

29

The district court permitted the Gardendale Board to operate the two elementary schools in Gardendale and stated that the schools must be zoned for students residing within the Gardendale City limits. Elementary students from North Smithfield must be zoned for another Jefferson County elementary school. The district court also directed counsel for all parties to develop and submit to the district court a proposed desegregation order "tailored to the specific circumstances of the Gardendale City Schools System." And it added that the proposal should "redraw the lines for Snow Rogers and Gardendale Elementary to address capacity issues at Gardendale Elementary." The district court then explained that it would consider a renewed motion by the Gardendale Board for the operation of all city schools, "Kindergarten through 12," in three years if the Gardendale Board operated the two elementary schools "in good faith compliance with the anticipated desegregation order."

The district court ordered counsel for all parties to develop a proposed facilities plan for the students attending Bragg Middle and Gardendale High. The plan would either place Gardendale High under the control of Jefferson County or place the high school facility in "an anticipated K-12 Gardendale district." In that case, the Gardendale Board would have to make an "appropriate payment" to the Jefferson County Board to help fund another facility. The Jefferson County Board must retain the middle and high schools until the district court orders otherwise.

30

And the Jefferson County Board must permit middle and high school students from North Smithfield to attend a school of their choice for the 2017–18 academic year. The plaintiffs, the United States, and the Jefferson County Board must then submit a joint proposal for the permanent zoning of the students. The district court also ordered the Gardendale City Council to appoint at least one black resident of Gardendale to the Gardendale Board within 60 days.

After the plaintiffs moved the district court to reconsider its order, the district court issued a supplemental opinion that defended its decision. The district court stated that prohibiting the secession might have been appropriate if it had "recently" issued a desegregation order and "kn[e]w that the [C]ounty, including Gardendale, would be subject to federal supervision for years." But because the 1971 order was "45 years old, and federal oversight of the Jefferson County Board of Education may be nearing an end, . . . the [district] [c]ourt decided to place the Gardendale Board under a new desegregation order that creates a fresh start for federal supervision of all aspects of the public schools in Gardendale." Without that "new" order, the district court reasoned, the residents of Gardendale could later try again to secede after the 1971 order is dissolved. The district court reasoned that it could not rely on its finding of a discriminatory purpose to prevent a future secession because it "must weigh the possibility that the plaintiff class would not succeed" in seeking "appropriate judicial review and relief" in the

31

future. The district court also explained that it was concerned about the resentment North Smithfield students would experience if it enjoined the secession, and it stressed that North Smithfield students would now benefit from the ability to choose the school they attend.

The district court maintained that its order was tailored to remedy the constitutional violation by the Gardendale Board and restored those harmed to the position they would have occupied had the violation not occurred. It stated that its order would reduce costs to the Jefferson County Board, give the Jefferson County Board certainty, allow the residents of Gardendale and Jefferson County to "heal from this dispute," and send a message "that any community contemplating separation at the expense of Jefferson County's desegregation efforts will pay a high price and will have no guarantee that the community will be able to separate."

The district court gave special weight to the interests of black Gardendale residents who supported the secession. It defended its decision to consider the motivations of Gardendale residents who supported the secession for nonracial reasons on the ground that "the residents whom the [district] [c]ourt had in mind are African-American." It later stated that it must consider the "message" that it will send to black parents if it prohibits the secession and forces them to choose between "having their African-American children attend a public school system

32

that these parents consider deficient or of moving to a municipal system elsewhere in Jefferson County that will give these parents the control that they desire."

The district court also revisited its finding that the secession would impede the desegregation efforts of the Jefferson County Board. It explained that although "it does not have a tool available that will enable it to erase the message of inferiority conveyed by the conduct of the Gardendale Board," its order mitigated the harm from the loss of Gardendale High and the displacement of students that currently attend Gardendale schools. It cited the requirement that Jefferson County retain control of the high school or receive an "appropriate payment." And it stated that it had "unambiguously signaled that it envisions the creation of a new middle and high school zone comprised of students" from a number of surrounding communities, including Mount Olive and North Smithfield. "Although the [district] [c]ourt did not explicitly order" that solution, it stated that its order would create, if implemented, a student population "*more* diverse" than the current student populations of the Gardendale middle and high schools.

In response to the plaintiffs' argument that the district court was bound by precedent and the law-of-the-case doctrine to deny the motion to secede, the district court declared that *Stout I* was overruled or simply inapplicable. It stated that *Wright* overruled the holding in *Stout I* that a district court must prohibit a secession if it finds that the secession will impede the desegregation efforts of a

33

larger school district. And, in the alternative, the district court stated that it "believes that both the Eleventh Circuit Court of Appeals and the Supreme Court would find that the age of this case diminishes the likelihood that Gardendale's separation would impede the county's effort to fulfill its desegregation obligations."

## II. STANDARDS OF REVIEW

"In school desegregation cases, we review *de novo* the district court's interpretation and application of the law," and we review its factual findings for clear error. *Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325, 1336 (11th Cir. 2005). "Clear error is a highly deferential standard of review." *Id.* at 1350 (discussing Federal Rule of Civil Procedure 52(a)). We may reverse a factual finding "*only* if the finding is clearly erroneous, is based on clearly erroneous subsidiary findings of fact, or is based on an erroneous view of the law." *Id.* (quoting *Barber v. Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers*, 778 F.2d 750, 754 (11th Cir. 1985)). We review evidentiary rulings and the validity of an equitable remedy for abuse of discretion. *See United States v. Dortch*, 696 F.3d 1104, 1110 (11th Cir. 2012) (evidentiary rulings); *U.S. Equal Emp't Opportunity Comm'n v. St. Joseph's Hosp., Inc.*, 842 F.3d 1333, 1343 (11th Cir. 2016) (equitable remedies); *see also Stell v. Savannah-Chatham Cty. Bd.*

34

*of Educ.*, 888 F.2d 82, 83 (11th Cir. 1989) (reviewing a remedial order in a desegregation case for abuse of discretion).

## III. DISCUSSION

We divide our discussion in three parts. First, we explain that the district court did not clearly err when it found that the Gardendale Board moved to secede for a racially discriminatory purpose. Second, we explain that the district court did not clearly err when it found, in the alternative, that the secession would impede the desegregation efforts of the Jefferson County Board. Third, we explain that the district court abused its discretion when it permitted the partial secession of the Gardendale Board.

### A. The District Court Did Not Clearly Err When It Found That the Gardendale Board Moved To Secede for a Racially Discriminatory Purpose.

The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. A facially neutral action by a state actor violates the Equal Protection Clause if it is done for a racially discriminatory purpose. *I.L. v. Alabama*, 739 F.3d 1273, 1277–78 (11th Cir. 2014). A discriminatory purpose exists if "racial discrimination was a substantial or motivating factor behind enactment of the law." *Id.* at 1286 (alteration adopted) (quoting *Hunter v. Underwood*, 471 U.S. 222, 228 (1985)). The Supreme Court has explained that "[d]etermining whether invidious

35

discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). Courts may consider the racial "impact of the official action," the "historical background of the decision," the "specific sequence of events leading up to the challenged decision," procedural or substantive "departures from the normal" sequence, and "legislative or administrative history." *Id.* at 266–68.

We review a finding of a racially discriminatory purpose for clear error. *See Holton*, 425 F.3d at 1350. "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* at 1351 (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985)). The existence of conflicting evidence is not sufficient to overturn a finding of fact if it is supported by substantial evidence. *Id.* at 1354; *see also id.* at 1353 ("The district court was not obliged to recite and analyze individually each and every piece of evidence presented by the parties."). We may reverse only if, after reviewing the evidence in its entirety, we are "left with the definite and firm conviction that a mistake has been committed." *Id.* at 1350 (quoting *Anderson*, 470 U.S. at 573).

The district court relied on relevant circumstantial and direct evidence to support its finding. The district court considered the "specific sequence of events leading up to the challenged decision" when it reviewed the public comments made by the secession supporters. *Arlington Heights*, 429 U.S. at 267. And it reasonably inferred that the secession leaders expressed "a desire to control the racial demographics of the four public schools in the City of Gardendale and the racial demographics of the city itself." The district court also considered the "legislative [and] administrative history," *id.* at 268, of the secession proposals and reasonably inferred that the secession leaders translated their discriminatory purpose into official action. That is, the Gardendale Board and its superintendent devised secession plans that reflect the same desire to control the racial demographics of the public schools as had been expressed by the secession leaders.

The Gardendale Board argues that the district court erred by imputing the discriminatory intent of private individuals to state actors, that the statements of private citizens are irrelevant, and that some of the statements should not have been admitted because they were not authenticated. The Gardendale Board also argues that the district court erred when it found that the statements of the private citizens were racially discriminatory. We disagree.

To be sure, only a state actor can violate the Fourteenth Amendment, but constituent statements and conduct can be relevant in determining the intent of

37

public officials. In *Arlington Heights*, the Supreme Court explained that

"[d]etermining whether invidious discriminatory purpose was a motivating factor

demands a sensitive inquiry into such circumstantial and direct evidence of intent

as may be available." *Id.* at 266. And as examples of the type of evidence that may

be considered, it listed the "historical background" of a decision and the "specific

sequence of events leading up to the challenged decision." *Id.* at 267. For example,

we have relied on evidence about the work of private lobbyists to hold that a

district court did not clearly err when it ruled that two state constitutional

amendments were "financially, and not discriminatorily, motivated." *I.L.*, 739 F.3d

at 1287. The district court in *I.L.* made its finding based on a record of "massive

resistance to substantial property tax increases; heavy support from the Alabama

Farm Bureau Federation, a powerful lobbying organization; and a clash between

rural and urban interests." *Id.* at 1287 (internal quotation marks and citations

omitted). And in *Washington v. Seattle School District No. 1*, the Supreme Court

affirmed a finding that a voter initiative was motivated by a discriminatory purpose

based on statements made by citizen sponsors and proponents. 458 U.S. 457, 471

(1982); *see also City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S.

188, 196–97 (2003) ("[S]tatements made by decisionmakers or referendum

sponsors during deliberation over a referendum may constitute relevant evidence

of discriminatory intent in a challenge to an ultimately enacted initiative.").

38

We recognize that the Supreme Court has cautioned against relying on "allegedly discriminatory voter sentiment" to find that "official acts were themselves motivated by racial animus" when there is no "show[ing] that the voters' sentiments can be attributed . . . to the state actors," *Cuyahoga Falls*, 538 U.S. at 195–97, but here that showing was made. The district court did not find that "statements made by private individuals . . ., in and of themselves, constitute[d] state action for the purposes of the Fourteenth Amendment." *Id.* at 196 (citation omitted). Nor did it, as the Gardendale Board argues, impermissibly ascribe the racially discriminatory motivations of a few to the actions of the Gardendale Board as a whole. The district court instead understood that the statements of those who played a primary role in lobbying for the state action "translate[d] their grassroots effort into official action." And the secession leaders became members of the Gardendale Board and advisory board. They testified that they "began having conversations with the mayor . . . and the council," and that they "put the mayor and the council in a head lock until they came to their own conclusions that the school system had to happen." They lobbied the Gardendale City Council to impose a five-mill tax, and they spearheaded the referendum initiative to impose an additional five-mill tax. Their statements and actions directly bear on the purpose of the Gardendale Board.

The Gardendale Board argues that the Facebook comments were improperly admitted because they are irrelevant, but this circumstantial evidence easily satisfies Federal Rule of Evidence 401 because the comments shed light on the motivations behind the creation and later actions of the Gardendale Board. Most of the Facebook posts cited by the district court were made by the secession leaders who spearheaded the movement and later became members of the Gardendale Board and its advisory board. And because the other posts were made on a Facebook page controlled by the secession leaders, those posts too are relevant in determining the intent of the secession leaders. The secession leaders were able to delete posts, approve or reject individuals who sought to join the page, block individuals who were previously approved to post on the page, and change the privacy settings of the page. Admitting this evidence was well within the "wide discretion [of the district court to] determin[e] the relevance of evidence produced at trial." *Cabello v. Fernández-Larios*, 402 F.3d 1148, 1161 (11th Cir. 2005).

The Gardendale Board argues that the Facebook comments were inadmissible because they were not authenticated, but that argument is meritless. "To authenticate a document," Federal Rule of Evidence 901 "only requires a proponent to present 'sufficient evidence to make out a prima facie case that the proffered evidence is what it purports to be.'" *United States v. Lebowitz*, 676 F.3d 1000, 1009 (11th Cir. 2012) (quoting *United States v. Belfast*, 611 F.3d 783, 819

40

(11th Cir. 2010)). We have explained that "[a] district court has discretion to determine authenticity, and that determination should not be disturbed on appeal absent a showing that there is no competent evidence in the record to support it." *Id.* (quoting *United States v. Siddiqui*, 235 F.3d 1318, 1322 (11th Cir. 2000)). The Facebook posts were the contents of a page that was controlled by the secession leaders and used to advocate for the proposed secession. And the posts were properly authenticated for that purpose. For example, the Gardendale Board conceded that the posts by someone with the username Chris Lucas were made by Chris Lucas. Tim Bagwell admitted that he was an active poster and made one of the comments ascribed to him. And David Salters likewise admitted to participating in some of the Facebook discussions. Of course, the Gardendale Board was free to challenge the *weight* given to the Facebook posts, but they were plainly *admissible*.

Finally, the Gardendale Board argues that the district court clearly erred when it found that the online comments prove discriminatory intent. It maintains that the comments have no racially discriminatory subtext and prove only that the residents of Gardendale wanted "to improve test scores, shrink class sizes, and reduce the number of students whose parents do not pay Gardendale property taxes." We disagree.

The findings by the district court are more than "plausible in light of the record viewed in its entirety," and we would "overstep[] the bounds of [our] duty under [Federal Rule of Civil Procedure] 52(a)" if we reversed—even if we were "convinced that [we] would have decided the case differently." *Holton*, 425 F.3d at 1351. As an appellate court, we do not have the luxury of deciding factual issues *de novo*. We affirm the finding that the Gardendale Board acted with a racially discriminatory purpose because that finding is amply supported by this record.

### B. The District Court Did Not Clearly Err When It Found That the Secession of Gardendale Would Impede the Desegregation Efforts of the Jefferson County Board.

In the alternative, the district court found that the secession of Gardendale would impede efforts to desegregate the schools operated by the Jefferson County Board. The Gardendale Board challenges that finding by arguing that the Jefferson County schools have already achieved unitary status and that, in any event, the secession would not impede the desegregation efforts of the Jefferson County Board. These arguments fail.

#### 1. Jefferson County Has Not Achieved Unitary Status.

The Gardendale Board argues that Jefferson County has already been declared unitary, but to support that argument, the Gardendale Board recites a few out-of-context statements from the decision of our predecessor circuit in *Stout III*. For example, in *Stout III*, the former Fifth Circuit stated that "the former dual

42

school system [in Jefferson County] has been effectively dismantled and a unitary system substituted," and later, it added that the district court found that "in Jefferson County[,] the uprooting of which the Court spoke has been done and a unitary system is operating." 537 F.2d at 802; *see also id.* at 803 ("[O]ur guiding lights are the trial court's conclusions that the Jefferson County system has been effectively desegregated and is unitary and that these three one-race schools are the products of geography and demography alone."). But both the Supreme Court and this Court have cautioned against reading these kinds of statements out of context. The whole of the *Stout III* opinion makes clear that Jefferson County has not fully fulfilled its desegregation obligations and remains subject to judicial oversight.

The Gardendale Board confuses two uses of the term "unitary," a mistake the Supreme Court identified in *Board of Education of Oklahoma City Public Schools v. Dowell* when it explained that "lower courts have been inconsistent in their use of the term 'unitary.'" 498 U.S. 237, 245 (1991). Our predecessor circuit did not rule that the school system had achieved "unitary status," a declaration that would be appropriate only if it had "eliminated the vestiges of its prior discrimination and ha[d] been adjudicated as such through the proper judicial procedures." *Id.* (quoting *Ga. State Branches of NAACP v. Georgia*, 775 F.2d 1403, 1413 n.12 (11th Cir. 1985)). It meant instead that the school system "ha[d] currently desegregated student assignments," whether or not "vestiges of past

43

discrimination" still remained. *Id.* Although the former Fifth Circuit stated that the Jefferson County schools were no longer formally segregated, it also ruled that the school system "must continue under the scrutiny and surveillance of the district court" and that "it would be appropriate, though [not] require[d] . . ., for the district court to give especial and renewed consideration to the possibility of broadening and making more attractive its existing majority-to-minority transfer procedures and to the possibility of enriching and strengthening the curriculum to magnet levels" in two facilities. *Stout III*, 537 F.2d at 803. That mandate of continued judicial oversight means that our predecessor circuit certainly did not "adjudicate[] [the unitary status of Jefferson County] through the proper judicial procedures." *Dowell*, 498 U.S. at 245 (quoting *Ga. State Branches of NAACP*, 775 F.2d at 1413 n.12).

To hold that *Stout III* declared that Jefferson County had achieved unitary status would contravene the principle that "'substance, not semantics, must govern' in remedying school segregation." *Holton*, 425 F.3d at 1340 (alteration adopted) (quoting *Swann*, 402 U.S. at 31). *Stout III* "makes clear" that the court did not intend to make a unitary-status determination, and "thus, it is wholly irrelevant what precise language the . . . court used." *Id.* (quoting *Lee v. Etowah Cty. Bd. of Educ.*, 963 F.2d 1416, 1424 n.9 (11th Cir. 1992)). Indeed, that principle is likely why we explained more than a decade after *Stout III* that the Jefferson County

44

school system "ha[d] [not] yet been declared unitary." *Brown v. Bd. of Educ. of Bessemer*, 808 F.2d 1445, 1446 (11th Cir. 1987).

    2.  The District Court Did Not Clearly Err When It Found That Permitting Gardendale To Secede Would Impede the Desegregation Efforts of the Jefferson County Board.

To determine whether a proposed secession would impede the desegregation efforts of a larger school district, a district court must consider the effect of the secession, *Ross v. Houston Indep. Sch. Dist.* (*Ross I*), 559 F.2d 937, 943, 944 (5th Cir. 1977), and the seceding district "bear[s] a heavy burden to show the lack of deleterious effects on desegregation," *Ross II*, 583 F.2d at 714; *see also Ross I*, 559 F.2d at 945 ("[T]he burden remains on [the splinter district] to establish that its implementation and operation will meet the tests . . . for permitting newly created districts to come into being for parts of districts already under an ongoing court desegregation order."). To satisfy its burden, the splinter district "must express its precise policy positions on each significant facet of school district operation," which includes all "areas of public school operations or support which the district court may specify as pertinent to the accomplishment of its underlying desegregation order." *Ross I*, 559 F.2d at 944.

In *Wright*, the Supreme Court considered three factors in particular: (1) the potential change in the racial composition of the city and county schools; (2) the ease of identifying the predominant race of the resulting school systems "by

reference to the racial composition of teachers and staff, the quality of school buildings and equipment, or the organization of sports activities"; and (3) the message the secession would send to black schoolchildren. 407 U.S. at 464–66 (quoting *Swann*, 402 U.S. at 18). The Supreme Court made clear that "[t]he weighing of the[] factors to determine their effect upon the process of desegregation is a delicate task that is aided by a sensitivity to local conditions, and the judgment is primarily the responsibility of the district judge." *Id.* at 466; *see also id.* at 466 n.13 ("Because of their proximity to local conditions and the possible need for further hearings, the courts which originally heard these cases can best perform this judicial appraisal." (quoting *Brown v. Bd. of Educ. of Topeka, Kan.* (*Brown II*), 349 U.S. 294, 299 (1955))). We will reverse a finding that a proposed secession will impede desegregation efforts only if the district court clearly erred. *See, e.g.*, *Ross II*, 583 F.2d at 715 n.6.

The district court did not clearly err when it found that the secession of Gardendale would have a substantial adverse effect on the desegregation efforts of the Jefferson County Board. The district court provided three rationales for the finding: the Gardendale school system would inherit Gardendale High, students displaced from the Gardendale schools would attend less racially diverse schools, and the secession movement communicated "messages of inferiority" to black students. Together, the three rationales support a finding that the secession will

46

adversely affect efforts to desegregate Jefferson County. *See Holton*, 425 F.3d at 1351.

We cannot fault the finding that the loss of Gardendale High will impede the desegregation efforts of the Jefferson County Board. Gardendale High houses a sophisticated career technical program strategically located to attract students from across the County. And both the Supreme Court and this Court have endorsed these kinds of magnet programs because they "have the advantage of encouraging voluntary movement of students within a school district in a pattern that aids desegregation on a voluntary basis, without requiring extensive busing and redrawing of district boundary lines." *Missouri v. Jenkins*, 515 U.S. 70, 92 (1995); *see also NAACP, Jacksonville Branch v. Duval Cty. Sch.*, 273 F.3d 960, 967–68 (11th Cir. 2001) (commending a school board for its use of magnet programs to encourage desegregation).

As the district court explained, the Gardendale secession would surely hinder efforts to desegregate Jefferson County because it would require the Jefferson County Board to forfeit this "desegregatory tool[]." It would give the Gardendale Board control over what could otherwise become, according to the district court, "one of Jefferson County's strongest examples of good faith implementation of the *Stout* desegregation order." The district court reasoned that under the December 2015 secession plan, the high school would only have a 54

47

percent utilization rate and would likely have a less racially diverse student population. In addition, the secession would not provide desegregation transfer opportunities, which would mean that black students from the surrounding areas in Jefferson County would be required to travel further to take advantage of that policy. The result, as the district court explained, would likely be a decline in students seeking to transfer schools. There would also be an obvious financial effect from the change in ownership with repercussions for the feasibility of other desegregation-related programs. And as we explained in *Ross II*, the district court is permitted to consider the "adverse financial [e]ffect [of a secession] on future desegregation efforts." 583 F.2d at 715.

The Gardendale Board argues that the district court "could have ordered Gardendale to keep th[e] [magnet] program open to County students without preference for Gardendale residents," but the burden rested with *Gardendale*—not the district court—to show that its plan would not impede the desegregation efforts of the Jefferson County Board. Because the Gardendale Board failed to satisfy that burden, the district court was entitled to find that the change in ownership militated against permitting the secession. *See id.* at 714.

Nor did the district court clearly err when it weighed evidence that the secession of Gardendale would result in fewer desegregated schools in Jefferson County. The district court found that the secession would force students at Bragg

48

Middle School and Gardendale High School to attend far less racially diverse schools. For example, the district court found that the student population of one receiving school is 99.59 percent white, and the student population of another is 85.33 percent black. We have criticized "racially identifiable" schools, *United States v. Lowndes Cty. Bd. of Educ.*, 878 F.2d 1301, 1308 (11th Cir. 1989), and explained that courts should consider "student assignments" when determining whether a school district has fully remedied the effects of *de jure* segregation, *NAACP, Jacksonville Branch*, 273 F.3d at 966.

The Gardendale Board misunderstands our precedent when it argues that the district court was not permitted to consider evidence related to the racial balance of the relevant schools. "Racial balance is not to be achieved for its own sake," but it is a valid consideration when "the unlawful *de jure* policy of a school system has been the cause of the racial imbalance in student attendance." *Freeman v. Pitts*, 503 U.S. 467, 494 (1992).

The third rationale offered by the district court—that permitting the secession would send "messages of inferiority" to black schoolchildren—is also supported by the law and the record. The district court reasoned that throughout the secession effort, "both words and deeds have communicated messages of inferiority and exclusion." It cited the Facebook comments, the "flyer bearing a photograph of a white student," the "public rejection of transfer students" by

49

Gardendale residents, the failure of the Gardendale Board to "disavow[] the belittling language of exclusion used by [secession] organizers and supporters," the inconsistent treatment of the North Smithfield children in the different draft secession plans, the failure of the Gardendale Board to "ma[k]e [a] commitment" to North Smithfield students, and the Gardendale superintendent's decision to attend Gardendale community events even though he refused an invitation to meet with the parents of North Smithfield students. In other words, as the Supreme Court did in *Wright*, the district court found that the secession movement communicated a "message" that "cannot have escaped the [black] children in the [C]ounty." 407 U.S. at 466.

True, the factual context in *Wright* was different. There, a predominantly white splinter district sought to secede immediately after a desegregation order issued. *Id.* at 465–66. But the Supreme Court did not limit its reasoning to messages of inferiority that result from the timing of a secession attempt. District courts may consider the message communicated for any number of reasons if a secession attempt "generates a feeling of inferiority" in black students that is akin to the message condemned in *Brown I*. *Id.* at 466 (quoting *Brown I*, 347 U.S. at 494). Here, the timing of the message was different, but the message was the same.

The argument of the Gardendale Board that "[t]here is no Equal Protection right to be shielded from offensive messages" is wholly beside the point. Neither

50

the district court nor the plaintiffs ever suggested that the secession effort violated such a right. The district court reasoned that the official acts of the Gardendale Board and other Gardendale officials, when considered in the light of the history of the secession movement, communicated a message that was intolerable under *Wright*.

The district court did not clearly err. Its "account of the evidence is plausible in light of the record viewed in its entirety." *Holton*, 425 F.3d at 1351. Indeed, the record amply supports its finding that the secession would impede the desegregation efforts of the Jefferson County Board. And "we cannot overturn the district court's finding of fact simply because [other] evidence [i]s merely conflicting." *Id.* at 1354 (alteration adopted) (quoting *Ga. State Conference of Branches of NAACP*, 775 F.2d at 1419).

## C. The District Court Abused Its Discretion By Permitting a Partial Secession.

Although the district court did not clearly err when it made its factual findings, we agree with the plaintiffs and the Jefferson County Board that it abused its discretion when it modified the desegregation order. By *sua sponte* amending the 1971 order to permit the partial secession of Gardendale, the district court misapplied the law governing both splinter districts and race discrimination. And it devised a novel remedy by weighing legally irrelevant—and sometimes legally

51

prohibited—factors. Both of the factual findings made by the district court permit only one ruling: denial of the motion to secede.

The district court erred when it ruled that a partial secession could be permitted even though the Gardendale Board had not proved a "lack of deleterious effects on desegregation." *Ross II*, 583 F.2d at 714. Because the Gardendale Board was the moving party, it bore the burden of proof. Our precedents make clear that a splinter district must propose and defend a secession plan that will not impede the desegregation efforts of the school district subject to an ongoing desegregation order. When the splinter district fails to satisfy that burden, "the district court may not . . . recognize [its] creation," *Stout I*, 448 F.2d at 404 (citation omitted). For example, in *Ross II*, we declared that "[t]he division of a school district operating under a desegregation order can be permitted only if the formation of the new district will not impede the dismantling of the dual school system in the old district," and "[i]n such a situation, the proponents of the new district must bear a heavy burden to show the lack of deleterious effects on desegregation." 583 F.2d at 714. Similarly, in *Ross I*, we explained that the burden to show that the "implementation and operation" of a splinter district "meet[s] the tests outlined for permitting newly created districts to come into being" remains at all times with the splinter district. 559 F.2d at 945. To satisfy that burden, the splinter district "must express its precise policy positions on each significant facet of school district

52

operation." *Id.* at 944. When the Gardendale Board failed to satisfy its burden, the district court should have denied the motion before it.

Although the district court acknowledged that at least one precedent, *Stout I*, required it to prohibit the secession, it erroneously concluded that the Supreme Court overruled that precedent in *Wright* and granted district courts greater discretion over whether to permit a splinter district. The district court read the statement in *Wright*, 407 U.S. at 460, that "[i]f [a secession] proposal would impede the dismantling of [a] dual system, then a district court, in the exercise of its remedial discretion, may enjoin it from being carried out" as granting a district court more flexibility. But *Wright* never suggested that a district court could fashion a more limited secession plan of its own making when it finds that a proposed plan would impede desegregation. *Wright* instead "h[e]ld only that a new school district may not be created where its effect would be to impede the process of dismantling a dual system." *Id.* at 470.

The district court also erred when it ruled that it was not bound to follow *Stout I* under the law-of-the-case doctrine, which provides that earlier decisions "bind[] all subsequent proceedings in the same case" as to "both findings of fact and conclusions of law." *United States v. Anderson*, 772 F.3d 662, 668 (11th Cir. 2014) (alteration adopted and citation and internal quotation marks omitted). The district court stated that "the facts of this case have changed" and that "it would

53

work a manifest injustice for th[e] [district] [c]ourt not to take the lack of activity in the case into account." Although there are "limited exceptions to the law-of-the-case doctrine [for situations in which] 'there is new evidence, an intervening change in controlling law dictates a different result, or the appellate decision, if implemented, would cause manifest injustice because it is clearly erroneous,'" *id.* at 668–69 (quoting *Litman v. Mass. Mut. Life Ins. Co.*, 825 F.2d 1506, 1510 (11th Cir. 1987) (en banc) (alteration adopted)), none of those exceptions apply here. *Stout I* remains good law. That precedent still governs proposed secessions of municipal school systems. And the district court provided no explanation for why its application would work a manifest injustice in this case.

We and the district court are bound by every other splinter-district decision of the Supreme Court and this Court, including *Wright*, *Ross I*, and *Ross II*. *See, e.g.*, *Main Drug, Inc. v. Aetna U.S. Healthcare, Inc.*, 475 F.3d 1228, 1230 (11th Cir. 2007) ("[W]ithout a clearly contrary opinion of the Supreme Court or of this court sitting en banc, we cannot overrule a decision of a prior panel of this court." (quoting *NLRB v. Datapoint Corp.*, 642 F.2d 123, 129 (5th Cir. Apr. 1981))). The age of these decisions does not diminish their precedential effect. If anything, their age enhances that effect. *See* Bryan A. Garner et al., *The Law of Judicial Precedent* 176 (2016) ("The fact that a case remains an accurate statement of the law through many generations often shows that it should be afforded special respect . . . .").

54

The finding that a racially discriminatory purpose motivated the Gardendale Board also obliged the district court to deny the motion to secede. The Supreme Court has explained that official actions motivated by a discriminatory purpose "ha[ve] no legitimacy at all under our Constitution." *City of Richmond v. United States*, 422 U.S. 358, 378 (1975); *see also id.* at 379 ("[A]cts generally lawful may become unlawful when done to accomplish an unlawful end . . . ." (quoting *Western Union Tel. Co. v. Foster*, 247 U.S. 105, 114 (1918))). That is why the Supreme Court has repeatedly invalidated government actions that violate the Equal Protection Clause. *See, e.g.*, *Hunter v. Underwood*, 471 U.S. 222, 233 (1985); *Seattle Sch. Dist. No. 1*, 458 U.S. at 487; *see also N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 239 (4th Cir. 2016) (collecting citations). To be sure, the Supreme Court has stated that district courts supervising school desegregation cases have "broad" equitable authority to remedy the effects of past *de jure* segregation. *Milliken v. Bradley*, 433 U.S. 267, 281 (1977); *see also Jenkins*, 515 U.S. at 88. But in those cases, the courts were not faced with a motion to amend an extant desegregation order. The 1971 order issued to ensure that the Jefferson County Board "eliminate[d] the vestiges of the unconstitutional *de jure* system" so that "the principal wrong of the *de jure* system, the injuries and stigma inflicted upon the race disfavored by the violation, is no longer present." *Holton*, 425 F.3d at 1337 (quoting *Freeman*, 503 U.S. at 485). Faced with a motion to

55

amend that order by a school board motivated by invidious discrimination, the district court was obliged to deny the motion.

The district court failed to abide by the mandate to "restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." *Jenkins*, 515 U.S. at 88 (citation and internal quotation marks omitted). Here, the clear way to "restore," "as nearly as possible," "the victims of [the] discriminatory conduct" was to deny the motion to secede. *Id.* (citation and internal quotation marks omitted). If the motion were denied, black schoolchildren who attend Gardendale schools would continue to benefit from the supervision of the Jefferson County Board, which is governed by a federal order to desegregate its schools. When the district court rejected this option in favor of permitting a new board created, in part, for the purpose of racial discrimination to control the educational policy of at least two schools, it abused its discretion. Its finding of a racially discriminatory purpose required the district court to deny the motion to secede in its entirety.

Instead of denying the motion to secede, the district court—unprompted by either party—devised its own secession plan. In doing so, it weighed a number of impermissible considerations and thereby abused its discretion.

The district court speculated that the 1971 order may soon be dissolved, and it drew a series of impermissible conclusions from that supposition. The district

56

court stated that if it permitted the secession, it would be "reluctant" to release Jefferson County from the 1971 order because of the "evidence of racial motivation in this case." In its later supplemental opinion, it appeared to be less concerned that Jefferson County might fail to obtain a unitary-status determination than that it would succeed. According to the district court, if Jefferson County were to succeed, the residents of Gardendale could again attempt to secede and, in that scenario, "there would be no federal desegregation order to protect zoning, interdistrict transfers, and the Gardendale high school facility." So it decided "to place the Gardendale Board under a new desegregation order that creates a fresh start for federal supervision of all aspects of the public schools in Gardendale." It added that the new order was appropriate because the plaintiffs may not be able to prove racially discriminatory purpose in the future and, without a constitutional violation, it would be unable to protect the plaintiffs. It stated that it is "not a safe assumption" that "in a few years, the situation in Gardendale will be identical to the set of circumstances that produced the [district] [c]ourt's finding that the Gardendale Board violated the Fourteenth Amendment." And it explained that it had to "weigh the possibility that the plaintiff class would not succeed" in proving racially discriminatory purpose.

Multiple errors plague this reasoning. As a threshold matter, the district court had no basis to speculate about the possibility that Jefferson County might or

might not obtain a determination of unitary status. The district court acknowledged that it "[did] not have before it information that [would] allow[] it to determine just how close Jefferson County may be to the end of supervision."

The district court was faced with a motion to amend the 1971 order and erred when it described its order as imposing a "new desegregation order." When a splinter district moves to secede from a school district governed by a desegregation order, the movant seeks to modify that order. So when the district court permitted the Gardendale Board to operate a new school system, it modified the 1971 order. If the district court *had* imposed an entirely new desegregation order, that order would have been unlawful. A new desegregation order may not be imposed to guard against the possibility that a constitutional violation will either soon be remedied or no longer exist. A desegregation order must instead remedy state-sanctioned segregation that has already been adjudicated. *See, e.g.*, *Jenkins*, 515 U.S. at 88 ("[F]ederal-court decrees must directly address and relate to the constitutional violation itself." (quoting *Milliken*, 433 U.S. at 282)). Although a racially discriminatory purpose motivated it to secede, the Gardendale Board had not implemented its plan so as to require a judicial remedy to unravel it. In other words, the Gardendale Board only *proposed* to violate the Fourteenth Amendment, and the district court was obliged to reject that proposal.

58

The district court also erred when it speculated that the possible social tension caused by finding a constitutional violation would warrant allowing the violation to succeed in part. The district court stated that it had to consider the interests of students from North Smithfield who "may feel unwelcome in Gardendale schools" if it denied the motion to secede. But even if the plaintiffs had suggested—contrary to their litigating position—that such a concern was plausible, the history of school desegregation is rife with conflict. Indeed, if animosity alone could thwart constitutional imperatives, *Brown II* would have been in error. As the Supreme Court put it then, "the vitality of . . . constitutional principles cannot be allowed to yield simply because of disagreement with them." *Brown II*, 349 U.S. at 300.

And the district court erred when it suggested that the benign motivations of some Gardendale residents could cure the discriminatory motivation of the Gardendale Board. The district court stated that it "must, to the extent practicable, honor the wishes of parents who support a local system simply because they want greater control over their children's education." But even if the parents the district court identified were state actors relevant to the constitutional analysis, *Wright* made clear that when a locality attempts to secede from a school district subject to an ongoing desegregation order, "[t]he existence of a permissible purpose cannot sustain an action that has an impermissible effect." 407 U.S. at 462. Even more

59

concerning, the district court gave special weight to the concerns of some Gardendale parents because of their race, which should be—and is—legally irrelevant.

At oral argument, the plaintiffs' counsel represented that they and the Jefferson County Board expect later this year to present the district court a plan for the final resolution of this litigation, which has lasted more than a half century. We encourage that effort to bring this remedial phase to an end. In the meantime, both *Wright* and our precedents about splinter districts still govern the Gardendale Board.

Of course, we do not suggest that the Gardendale Board of Education is "forever [a] vassal[] of the [C]ounty [B]oard." *Stout II*, 466 F.2d at 1215. The authority of the judiciary to intervene in the "local autonomy" of Jefferson County, *Jenkins*, 515 U.S. at 99, is tied to the constitutional violation at issue: the earlier *de jure* segregation of schools. If the Gardendale Board, for permissible purposes in the future, satisfies its burden to develop a secession plan that will not impede the desegregation efforts of the Jefferson County Board, then the district court may not prohibit the secession. We do not belittle the "need that is strongly felt in our society" to have "[d]irect control over decisions vitally affecting the education of one's children." *Wright*, 407 U.S. at 469. Indeed, the "local autonomy of school districts is a vital national tradition." *Jenkins*, 515 U.S. at 99. We hold only that the

60

desire for local autonomy must yield when a constitutional violation is found and

remains unremedied.

## IV. CONCLUSION

We **AFFIRM IN PART, REVERSE IN PART,** and **REMAND WITH INSTRUCTIONS TO DENY THE MOTION OF THE GARDENDALE BOARD TO SECEDE.**

61