IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

No. 18-10151

_____

D.C. Docket No. 2:15-cv-02193-LSC


GREATER BIRMINGHAM MINISTRIES,
ALABAMA STATE CONFERENCE OF THE NATIONAL ASSOCIATION
FOR THE ADVANCEMENT OF COLORED PEOPLE,
GIOVANA AMBROSIO,
ELIZABETH WARE,
SHAMEKA HARRIS,

Plaintiffs- Appellants,


versus


SECRETARY OF STATE FOR THE STATE OF ALABAMA,

Defendant - Appellee.


_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

Before WILLIAM PRYOR, Chief Judge, WILSON, MARTIN, JORDAN,
ROSENBAUM, JILL PRYOR, NEWSOM, BRANCH, GRANT, LUCK, and
LAGOA, Circuit Judges.[*]

BY THE COURT:

_____

[*] Judge Andrew Brasher recused himself and did not participate in the en banc poll.

A petition for rehearing having been filed and a member of this Court in active service having requested a poll on whether this appeal should be reheard by the Court sitting en banc, and a majority of the judges in active service on this Court having voted against granting rehearing en banc, it is ORDERED that this appeal will not be reheard en banc.

BRANCH, Circuit Judge, respecting the denial of rehearing en banc:

A majority of the Court has voted not to rehear this case en banc. Although the panel opinion fully addresses my dissenting colleague's arguments, *see Greater Birmingham Ministries v. Sec'y of State*, 992 F.3d 1299 (11th Cir. 2021), I write to emphasize three points.

*First*, the dissent argues that our discussion of *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), was improper. But *Crawford* is Supreme Court precedent, and we are bound to follow it. *See United States v. Johnson*, 921 F.3d 991, 1001 (11th Cir. 2019). In *Crawford*, the Supreme Court held that Indiana's interests in deterring and detecting voter fraud, improving and modernizing election procedures, addressing mismanagement of voter rolls, and safeguarding voter confidence were "unquestionably relevant to the State's [legitimate] interest in protecting the integrity and reliability of the electoral process." 553 U.S. at 191. Alabama invoked nearly identical interests here and it thus would have been inappropriate for us to ignore *Crawford*.[1]

---

[1] Even the cases the dissent cites to justify its concern acknowledge that "*Crawford* clearly establishes that states have strong interests in preventing voter fraud and increasing voter confidence by safeguarding the integrity of elections." *Veasey v. Abbott*, 830 F.3d 216, 249 (5th Cir. 2016) (en banc); *see N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 235 (4th Cir. 2016) (discussing *Crawford* and acknowledging that North Carolina "has an interest in preventing voter fraud" and that "a photo ID requirement [may] constitute[] one way to serve that interest").

*Second*, the dissent faults us for questioning the applicability of the *Gingles* factors to vote denial claims under Section 2 of the VRA. *See Thornburg v. Gingles*, 478 U.S. 30 (1986). Nevertheless, it admits that "*Gingles* is a case that addresses claims of vote *dilution*, not of vote *denial*, brought under VRA § 2." I agree that this distinction is meaningful. *See Greater Birmingham Ministries*, 992 F.3d at 1331–32.

We were not the first to question the applicability of the *Gingles* factors to vote denial claims. The First and Sixth Circuits have also done so. *See Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 626 (6th Cir. 2016) ("Because the Court has yet to consider a Section 2 vote-denial claim after *Gingles*, the standard for such adjudication is unsettled."); *Simmons v. Galvin*, 575 F.3d 24, 42 n.24 (1st Cir. 2009) (noting that "[w]hile *Gingles* and its progeny have generated a well-established standard for vote dilution, a satisfactory test for vote denial cases under Section 2 has yet to emerge . . . [and that] the Supreme Court's seminal opinion in *Gingles* . . . is of little use in vote denial cases" (quotation omitted)).

Because the *Gingles* factors originated in the vote dilution context, several of the factors do not fit into a vote denial analysis. Consider these factors: "unusually large election districts, majority vote requirements, prohibitions against bullet voting, candidate slating processes, racial appeals in political campaigns, or minorities being elected to public office." *Id*. at 1332. The dissent does not

4

explain how these factors fit into a vote denial analysis; its only response is to say that "not all factors need to be met for [*Gingles*] to apply." But this unsatisfactory response fails to demonstrate that the panel opinion was wrong to question the applicability of the *Gingles* factors here.

*Third*, the dissent argues that we misapplied the summary judgment standard. This criticism rehashes the panel dissent's arguments, which the panel opinion thoroughly rebutted and rejected. One point bears repeating. The dissent argues that we improperly resolved a dispute of material fact because "[p]laintiffs offered evidence showing that the photo ID law affects more than 118,000 voters." But that argument ignores circuit precedent—precedent that the dissent itself quotes: "When considering disparate effect the focus should not be on absolute numbers but rather on whether the challenged requirements operate to disqualify [minority voters] at a substantially higher rate." *Williams v. City of Dothan*, 818 F.2d 755, 764 (11th Cir. 1987) (quotation omitted).

The panel opinion considered whether Alabama's law operated to disqualify minority voters at a substantially higher rate than white voters and concluded that it does not. "There is only a 1% difference between the ID possession rates of white and minority Alabama voters." *Greater Birmingham Ministries*, 992 F.3d at 1330. Although the dissent calculates that minority voters are up to 2.10 times more likely than white voters to lack a qualifying photo ID, that calculation is "a misuse

5

of data," because the small numbers involved "mask[] the fact that the populations [are] effectively identical." *Greater Birmingham Ministries*, 992 F.3d at 1330 (quoting *Frank v. Walker*, 768 F.3d 744, 753 n.3 (7th Cir. 2014)).

"It is undisputed that approximately 99% of white voters and 98% of black voters possess a photo ID." *Id.* at 1329. Because "[t]here is only a 1% difference between the ID possession rates of white and minority Alabama voters," *id.* at 1330, the panel did not err in affirming the district court's decision.

MARTIN, Circuit Judge, joined by WILSON, ROSENBAUM, and JILL PRYOR, Circuit Judges, dissenting from the denial of rehearing en banc:

I believe the panel opinion in Greater Birmingham Ministries v. Secretary of State for Alabama ("GBM"), 992 F.3d 1299 (11th Cir. 2021), erred on several points of interpretation.[1]  I asked the whole court to reconsider the panel opinion, but the majority of active judges voted to leave the panel opinion in place.  I therefore write in dissent to memorialize the problems created by the panel opinion, which now stands as the law of our Circuit.

The Plaintiffs who brought this suit are the Greater Birmingham Ministries and the Alabama State Conference of the National Association for the Advancement of Colored People, along with Giovana Ambrosio, Shameka Harris, Debra Silvers, and Elizabeth Ware.  Together they challenge Alabama's 2011 Photo Voter Identification Law, Ala. Code § 17-9-30 ("photo ID law"[2]).  GBM, 992 F.3d at 1304–05.  The photo ID law requires all Alabama voters to present a photo ID when casting in-person and absentee votes.  Id. at 1304.  Plaintiffs believe the photo ID law discriminates on the basis of race in violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution; § 2 of the Voting

---

[1] The panel vacated its original opinion, Greater Birmingham Ministries v. Secretary of State for Alabama, 966 F.3d 1202 (11th Cir. 2020), and substituted the 2021 opinion in its place. GBM, 992 F.3d at 1304.

[2] The District Court referred to the law as the "Photo ID Law," and the majority opinion refers to it as the "voter ID law."  I use the term "photo ID law" as I find it a clearer descriptive.

Rights Act ("VRA"), 52 U.S.C. § 10301; and § 201 of the VRA, 52 U.S.C. § 10501. Id. A divided panel affirmed the District Court's grant of summary judgment in favor of the Defendant, the Alabama Secretary of State John Merrill.[3] Id.

I believe the panel resolved this appeal incorrectly on the following issues:

1) The panel relied on Crawford v. Marion County Election Board, 553 U.S. 181, 128 S. Ct. 1610 (2008), which is a case addressing a partisan challenge to a photo ID law, see id. at 203–04, 128 S. Ct. at 1623–24, in its analysis of this case alleging race discrimination.

2) The panel rejected use of the Gingles factors, see Thornburg v. Gingles, 478 U.S. 30, 106 S. Ct. 2752 (1986), saying these factors don't apply to a VRA § 2 vote denial claim, despite our Court's contrary precedent, see Burton v. City of Belle Glade, 178 F.3d 1175, 1197–98 (11th Cir. 1999), as well as caselaw from our sister circuits applying Gingles factors to VRA § 2 vote denial claims.

3) The panel misapplied the summary judgment standard when it weighed conflicting evidence and resolved genuine disputes of material fact. Contra Jones v. UPS Ground Freight, 683 F.3d 1283, 1292 (11th Cir. 2012).

I will start by summarizing the facts and procedural history, and then set out how the majority's reasoning is in tension, and sometimes in direct conflict, with Supreme Court precedent, our own precedent, and that of our sister circuits.

---

[3] The Honorable Darrin P. Gayles, United States District Judge for the Southern District of Florida, sat by designation on the panel and dissented from the majority opinion. Even though the opinion was not unanimous, I refer to it as the panel opinion.

8

**I.**

Plaintiffs challenge the Alabama photo ID law that got its start as House Bill 19 ("HB19") in the Alabama Legislature. GBM, 922 F.3d at 1307. Though I will discuss the passage of HB19 in greater detail below, for now it is sufficient to say that the legislature was successful in passing the bill and Governor Robert Bentley signed HB19 into law on June 15, 2011. Id. at 1308.

The photo ID law requires both in-person and absentee voters to present a photo ID to vote. Id. at 1308–09 (citing Ala. Code § 17-9-30(a)(1)–(7), (b)). If a voter arrives at a polling place without a valid photo ID on election day, that voter can (1) cast a provisional ballot and cure the photo ID defect by bringing a photo ID to the Board of Registrars' office by the Friday following the election, or (2) use the photo ID law's "positively identify provision" to cast a vote via regular ballot.[4] Id. at 1311 (quotation marks omitted). The photo ID law has been enforced in every election since June 2014. Id.

---

[4] The photo ID law's "positively identify provision" states:

> In addition, an individual who does not have valid photo identification in his or her possession at the polls shall be permitted to vote if the individual is positively identified by two election officials as a voter on the poll list who is eligible to vote and the election officials sign a sworn affidavit so stating.

Ala. Code § 17-9-30(f).

9

Plaintiffs allege the photo ID law violates the Fourteenth and Fifteenth Amendments, as well as § 2 of the VRA.  Id. at 1315.  They argue both that the passage of the law was motivated by racial discrimination and that the enacted statute has a discriminatory effect.  Id.  They also allege the "positively identify provision" constitutes an illegal "test or device" in violation of § 201 of the VRA. Id. (quotation marks omitted).

Secretary Merrill filed a motion for summary judgment and Plaintiffs filed a motion for partial summary judgment.  Id.  The District Court considered these cross-motions at the same time and granted Secretary Merrill's motion, dismissing all Plaintiffs' claims.  Id. at 1315–16.  The court denied Plaintiffs' motion for partial summary judgment.  Id.; see also Greater Birmingham Ministries v. Merrill ("GBM (Dist. Ct.)"), 284 F. Supp. 3d 1253, 1256 (N.D. Ala. 2018).[5]

I will start with the panel's conclusion that Plaintiffs' claims of race discrimination brought under the Fourteenth and Fifteenth Amendments require proof of both discriminatory intent and effect.  GBM, 922 F.3d at 1321.  The District Court chose not to address the question of discriminatory intent, finding it was "not necessary" to resolve.  GBM (Dist. Ct.), 284 F. Supp. 3d at 1273.

_____

[5] Plaintiffs moved for partial summary judgment on one "discrete issue, i.e., that Black and Hispanic voters are statistically less likely than white voters to possess one of the required forms of photo ID to vote in Alabama."  GBM (Dist. Ct.), 284 F. Supp. 3d at 1274 n.6.  The District Court denied the motion as moot in light of its grant of summary judgment on all claims to Secretary Merrill.  Id.  The panel affirmed.  GBM, 922 F.3d at 1304.

Instead, the District Court granted Secretary Merrill's summary judgment motion by finding no genuine dispute of material fact on the topic of whether the photo ID law has a discriminatory effect. See id. at 1273–74 ("[T]he Photo ID Law does not in fact discriminate on the basis of race."). "Frankly," the District Court wrote, "the discrepancy in photo ID possession rates among white, Black, and Hispanic registered voters in Alabama is miniscule." Id. at 1274. Once in our Court, the panel recounted:

> Although it was undisputed that minority registered voters are statistically more likely than white voters to lack the required ID, the district court determined that "a person who does not have a photo ID today is not prevented from voting if he or she can easily get one, and it is so easy to get a photo ID in AL, no one is prevented from voting."

GBM, 922 F.3d at 1315–16 (quoting GBM (Dist. Ct.), 284 F. Supp. 3d at 1274).

Thus, although the panel concluded that even though Plaintiffs do "clear the hurdle of demonstrating that minority voters are less likely than white voters to possess photo ID," id. at 1329, it said "no reasonable factfinder could find that Alabama's voter ID law is unconstitutionally discriminatory based on the evidence presented," id. at 1337.

11

**II.**

I now address several grounds on which I believe the majority opinion erred.

**A. The majority erred in relying on <u>Crawford</u>, a case concerning <u>partisan</u> discrimination, in addressing claims of <u>race</u> discrimination.**

This case brings claims of race discrimination constituting violations of the Fourteenth and Fifteenth Amendments.  Yet the majority opinion began its analysis of these claims by stating, "[a]t the outset . . . Plaintiffs have failed to distinguish meaningfully their grievances from those raised more than a decade ago" by the plaintiffs in <u>Crawford</u>.  <u>GBM</u>, 992 F.3d at 1318–19.  Thus, from the beginning, the opinion sets out on the wrong path.  <u>Crawford</u> never addresses <u>race</u> discrimination, so it cannot properly govern the resolution of the race discrimination claims made here.  <u>Crawford</u> may at first have some surface appeal, insofar as it addressed a facial challenge to a photo ID law.  However, that surface appeal quickly subsides, because <u>Crawford</u> addressed the photo ID issue based only on allegations of <u>partisan</u> discrimination.  <u>See Crawford</u>, 553 U.S. at 191, 128 S. Ct. at 1617 ("[P]etitioners argue that the statute was actually motivated by partisan concerns[.]"); <u>see also</u> <u>id.</u> at 203, 128 S. Ct. at 1623–24 (explaining that "the litigation was the result of a partisan dispute").  Therefore, <u>Crawford</u> offers limited guidance here.

To its credit, the panel recognized that Crawford did not address race discrimination. But it nevertheless went on to say that Crawford controlled. Specifically, the majority "readily acknowledge[d] that the challengers in Crawford did not allege intentional race discrimination," but said that "[i]n two key respects, this case is the same: (1) the alleged voter burdens facing Alabamians are essentially the same as the burdens imposed on Indiana voters in 2008 that the Supreme Court upheld as constitutionally valid, and (2) Alabama's stated interests in passing a photo ID law echo the state interests espoused by Indiana that were held to be sufficient in Crawford." GBM, 992 F.3d at 1319 (emphasis added). The majority concluded that Crawford compelled the dismissal of Plaintiffs' Fourteenth and Fifteenth Amendment claims because the Supreme Court in Crawford recognized that photo ID laws serve important state interests. See id. at 1320 ("Alabama's interests in passing the voter ID law are not substantively different from the neutral, nondiscriminatory reasons espoused by Indiana and upheld by the Supreme Court in Crawford."); id. at 1325–27 (relying on Crawford to conclude that the photo ID law was passed with "valid neutral justifications").

I believe this was error. The majority took a broad reading of Crawford to conclude that photo ID laws are supported by a legitimate state interest. But other circuits have recognized that challenges to photo ID laws based on race discrimination are properly evaluated on a separate track than the type of claim

13

addressed in Crawford.  As a result, those circuits have rejected the sweeping implication the panel appeared to draw from Crawford.  Take, for instance, the Fourth Circuit, which enjoined a photo ID requirement as disproportionately affecting African-American voters.  N.C. State Conf. of NAACP v. McCrory, 831 F.3d 204, 235, 241 (4th Cir. 2016).  It characterized the state's reliance on Crawford in that case as "misplaced," because of the "fundamental differences between Crawford and this case."  Id. at 235.  It explained: "The challengers in Crawford did not even allege intentional race discrimination.  Rather, they mounted a facial attack on a photo ID requirement as unduly burdensome on the right to vote generally."  Id.  When there is evidence of discriminatory intent, the state is not owed the deference that Crawford otherwise affords state election laws. Id.  The Fifth and Seventh Circuits have also rejected the reasoning our Court has adopted.  See Veasey v. Abbott, 830 F.3d 216, 248 (5th Cir. 2016) (en banc) ("[W]e reject the argument that Crawford mandates upholding [the photo ID law challenged as racially discriminatory] simply because the State expressed legitimate justifications for passing the law."); Frank v. Walker, 819 F.3d 384, 386–88 (7th Cir. 2016) (vacating portion of district court order that relied on Crawford to deny plaintiffs' request for an injunction against a photo ID law); see also Frank v. Walker, 141 F. Supp. 3d 932, 935–36 (E.D. Wis. 2015), vacated in part, 819 F.3d 384 (7th Cir. 2016).

14

The panel then compounded its error by applying Crawford to dismiss not only Plaintiffs' Fourteenth and Fifteenth Amendment race discrimination claims, but Plaintiffs' VRA § 2 race discrimination claim as well. See GBM, 992 F.3d at 1327–28, 1334. The panel invoked Crawford to reject Plaintiffs' arguments that the stated purpose of the photo ID law, i.e., combating voter fraud, was pretext. Id. at 1334. But again, Plaintiffs' assertion of pretext was made in the context of race discrimination, which renders Crawford inapposite. After all, "Crawford contains no mention of Section 2 or the Voting Rights Act." Veasey, 830 F.3d at 249. Crawford addressed only the Anderson-Burdick framework.[6] As other courts have recognized, the Anderson-Burdick framework "involves a different analytical framework" than VRA § 2 claims. Id.

The majority opinion's reliance on Crawford throughout its analysis of Plaintiffs' race discrimination claims was in error.

### B. The majority erred in rejecting the applicability of the Gingles factors in evaluating Plaintiffs' VRA § 2 vote denial claim.

The majority was also mistaken when it concluded that the factors the Supreme Court set out in Gingles, 478 U.S. 30, 106 S. Ct. 2752, do not apply to Plaintiffs' VRA § 2 vote denial claim.[7]

---

[6] See Burdick v. Takushi, 504 U.S. 428, 434, 112 S. Ct. 2059, 2063 (1992); Anderson v. Celebrezze, 460 U.S. 780, 789, 103 S. Ct. 1564, 1570 (1983).

[7] In Gingles, the Supreme Court first construed the VRA § 2 as amended in 1982. See Bartlett v. Strickland, 556 U.S. 1, 10–11, 129 S. Ct. 1231, 1241 (2009) (citing 96 Stat. 134, 42

Plaintiffs brought a claim under VRA § 2, alleging impermissible denial of the right to vote, also known as a "vote denial" claim.  See GBM, 992 F.3d at 1328, 1331.  As amended in 1982, § 2 of the VRA provides:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).
>
> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

52 U.S.C. § 10301 (emphases added).

Plaintiffs allege that the photo ID law and its implementation "violate Section 2 of the VRA because it results in minority voters having less opportunity than white voters to participate effectively in the political process and to elect

---

U.S.C. § 1973(a)).  The Supreme Court set forth various factors, now known as the "Gingles factors," for evaluating a claim brought under VRA § 2.  See Gingles, 478 U.S. at 43–51, 106 S. Ct. at 2762–67.  The factors are based in part on the Senate Report accompanying the 1982 amendment, indicating considerations that may, in "the totality of the circumstances," support a claim of racial vote dilution.  Nipper v. Smith, 39 F.3d 1494, 1511 (11th Cir. 1994) (en banc) (quotation marks omitted); see also id. at 1512 ("The Gingles threshold factors . . . constitute essentially a gloss on the Senate factors." (quotation marks omitted)).

16

candidates of their choice" and "having less opportunity to participate effectively in the political process in Alabama on account of race, color, or language minority status." GBM, 992 F.3d at 1328 (quotation marks omitted). The panel opinion affirms the District Court's grant of summary judgment to Secretary Merrill on this claim, id., but it does so in a manner that makes our Circuit an outlier in VRA § 2 vote denial caselaw.

The fundamental error made by the panel is asserting that the factors under the Supreme Court's seminal case in Gingles are "inapplicable." GBM, 992 F.3d at 1332. True, Gingles is a case that addresses claims of vote dilution, not of vote denial, brought under VRA § 2. See Gingles, 478 U.S. at 46, 106 S. Ct. at 2764. I also acknowledge that "there is a paucity of appellate case law evaluating the merits of Section 2 claims in the vote-denial context." League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 239 (4th Cir. 2014); see also Christopher S. Elmendorf & Douglas M. Spencer, Administering Section 2 of the Voting Rights Act After Shelby County, 115 Colum. L. Rev. 2143, 2183 (2015) (summarizing appellate caselaw on § 2 vote denial). But courts, including our own, have repeatedly recognized that Gingles applies to § 2 vote denial claims. See Burton, 178 F.3d at 1197–98 (analyzing a § 2 vote denial claim with reference to the Gingles factors but concluding that the plaintiffs, tenants of a housing project, had not offered sufficient evidence that the particular housing project had a

history of race discrimination with respect to voting).  As one of our sister circuits explained:

> Appellants suggest that the "Senate factors" apply only to "vote dilution" claims.  To the contrary, the "totality of the circumstances" test established in § 2(b) was initially applied only in "vote denial" claims such as this.  In Thornburg v. Gingles, the Supreme Court carefully examined the legislative history to reach the conclusion that § 2(b) and the Committee's explanatory factors apply to vote dilution claims as well.

Smith v. Salt River Project Agric. Improvement & Power Dist., 109 F.3d 586, 596 n.8 (9th Cir. 1997) (citing Gingles, 478 U.S. at 43–46, 106 S. Ct. at 2762–64).

When it rejected, out of hand, the application of the Gingles factors, the panel appeared to overlook not only the Gingles factors' textual basis in VRA § 2, see supra at 16 (quoting 52 U.S.C. § 10301), but also this Circuit's prior panel precedent, see Burton, 178 F.3d at 1197–98, as well as the substantial caselaw of our sister circuits explaining the rightful application of Gingles to VRA § 2 vote denial claims.  But this does not consider the tests developed by the Fourth, Fifth, and Sixth Circuits to address § 2 vote denial claims.  As the Fifth Circuit summarized, the framework has two elements:

> (1) The challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice, and

18

(2) That burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.

Veasey, 830 F.3d at 244 (alterations adopted). "The second part of the two-part framework draws on the Supreme Court's guidance in Gingles." Id. at 245.

This approach exemplifies what has been a "near-consensus" of circuit caselaw that recognizes "the Senate Report and Gingles provide guidance in the vote-denial context." Id. at 274 (Higginson, J., concurring); see, e.g., id. at 244 (Fifth Circuit "adopt[ing] the two-part framework employed by the Fourth and Sixth Circuits to evaluate Section 2 'results' claims."); League of Women Voters, 769 F.3d at 240 (Fourth Circuit providing a two-part test drawing from Gingles); Ohio State Conf. of NAACP v. Husted, 768 F.3d 524, 554 (6th Cir. 2014) (Sixth Circuit providing a two-part test drawing from Gingles), vacated on other grounds by No. 14-3877, 2014 WL 10384647, at *1 (6th Cir. Oct. 1, 2014); Smith, 109 F.3d at 591 (Ninth Circuit setting forth test in a § 2 vote denial case drawing from Gingles).

The Gingles factors do apply to Plaintiffs' § 2 vote denial claim. The second part of the Fifth Circuit's test illustrates precisely why: "This second part of the framework provides the requisite causal link between the burden on voting rights and the fact that this burden affects minorities disparately because it interacts with social and historical conditions that have produced discrimination against

19

minorities currently, in the past, or both." Veasey, 830 F.3d at 245. In other words, Gingles touches on the very heart of a § 2 vote denial claim. See Gingles, 478 U.S. at 47, 106 S. Ct. at 2764 ("The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."). And as the Supreme Court explained, "there is no requirement that any particular number of factors be proved," so not all factors need to be met for the case to apply. Id. at 45, 106 S. Ct. at 2763 (quotation marks omitted).

Yet in the face of the text of VRA § 2, our prior panel precedent applying the Gingles factors in a § 2 vote denial case, see Burton, 178 F.3d at 1197–98, and the weight of out-of-circuit authorities on this very issue, the majority opinion stated:

> As a threshold matter, we question the applicability of Gingles to this case. Gingles was a vote dilution case and this case involves vote denial, a fundamentally different claim. . . . How, then, can we apply the factors in this case? The obvious answer is that we cannot. We will attempt to do so, however, in order to demonstrate the futility of the exercise.

GBM, 992 F.3d at 1331–32; see also id. at 1332 ("[T]he Gingles factors are inapplicable[.]").

Although the panel proceeded to address each <u>Gingles</u> factor, its starting point, that the factors in <u>Gingles</u> were "inapplicable" is simply wrong. <u>Id.</u> at 1332. The panel emphasized at the end of its <u>Gingles</u> analysis a purported "fundamental misalignment" between the <u>Gingles</u> factors and VRA § 2 vote denial claims. And the panel relied on this "misalignment" to excuse "the district court's failure to analyze them." <u>Id.</u> at 1334. But again, the majority's rejection of <u>Gingles</u> in the VRA § 2 vote denial context is simply not supported by the law.

## C. The majority erred in its application of the summary judgment standard.

I will turn to how the majority opinion misapplied the summary judgment standard.

This Court reviews <u>de novo</u> "a district court's rulings on cross-motions for summary judgment, and the facts are viewed in the light most favorable to the non-moving party on each motion." <u>Chavez v. Mercantil Commercebank, N.A.</u>, 701 F.3d 896, 899 (11th Cir. 2012) (internal citations omitted). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court "may not weigh conflicting evidence or make credibility determinations of [its] own. If the record presents disputed issues of fact, the court may not decide them; rather, [it] must deny the motion and proceed to trial." <u>Jones</u>, 683 F.3d at 1292 (quotation marks omitted).

21

As the panel recognized, "summary judgment is not often granted in vote[] denial lawsuits." GBM, 992 F.3d at 1317. The District Court acknowledged as well that generally in "election law cases, it has been appropriate for the trier of fact to engage in the delicate and highly fact-sensitive consideration of the kinds of testimony and historical facts" presented. GBM (Dist. Ct.), 284 F. Supp. 3d at 1273. Both my court and the District Court were on the right track with these observations because "[l]egislative motivation or intent is a paradigmatic fact question." Id. (quoting Prejean v. Foster, 227 F.3d 504, 509 (5th Cir. 2000)).

Yet, despite their acknowledgments, both the District Court and the panel seem to have resolved disputes of material fact in the light most favorable to Secretary Merrill, who was the movant. They did this with respect to two prongs of their analysis: discriminatory impact and discriminatory intent. I address each in turn.

1. The majority erred in resolving factual disputes concerning discriminatory impact in a light most favorable to the movant.

Both the District Court and the panel ruled there is no genuine dispute of material fact about whether the photo ID law had a discriminatory impact on Black and Latino voters. And they made these rulings despite the evidence of statistical disparities presented.

As the panel opinion recognized, the parties presented "differing expert evidence" indicating that somewhere between 32,704 and 118,152 voters in

22

Alabama lack any form of photo ID required by the voter ID law or otherwise lack a "useable ID" because their ID is, for example, expired. GBM, 992 F.3d at 1312–13 (quotation marks omitted). Plaintiffs' expert opined that an estimated 1.67% of registered voters in Alabama have no valid photo ID that is accepted under the photo ID law. Id. at 1313. Plaintiffs' expert broke this number down to say that 1.37% of white voters, 2.44% of black voters, and 2.29% of Latino voters do not possess an ID compliant with the photo ID law. Id. On the other hand, Secretary Merrill's expert opined that 1.03% of registered Alabama voters lack a photo ID, specifically 0.87% of white voters, 1.44% of black voters, and 1.26% of Latino voters. Id.

As the District Court surveyed, "Plaintiffs' expert Dr. Bernard Siskin says there are around 50,000 registered voters in Alabama (or 1.67% of the registered voter population) who may not have any of the forms of photo ID that may be used for voting," and that "1.37% of white registered voters, 2.44% of Black registered voters, and 2.29% of Hispanic registered voters may not currently have an acceptable photo ID." GBM (Dist. Ct.), 284 F. Supp. 3d at 1274. Based on this testimony, the District Court correctly observed: "the numbers show that Black and Latino registered voters are almost twice as likely as white voters to lack an acceptable photo ID for voting."[8] Id. Notwithstanding these statistical disparities,

---

[8] The District Court also noted that Secretary Merrill's expert's numbers "differ

however, the District Court made the following finding: "Frankly, the discrepancy in photo ID possession rates among white, Black, and Hispanic registered voters in Alabama is miniscule.  In other words, it appears that very few registrants of <u>any</u> racial group may presently be affected by the Photo ID Law."  <u>Id.</u>  Apparently setting aside the statistics provided by the experts, the District Court found: "in the end, Dr. Siskin's estimate does not matter.  This is because a person who does not have a photo ID today is not prevented from voting if he or she can easily get one, and it is so easy to get a photo ID in Alabama, <u>no one</u> is prevented from voting." <u>Id.</u>

These factual findings—that the discrepancy was "miniscule" and that, as a matter of fact, "it is so easy to get a photo ID in Alabama" that "no one is prevented from voting"—were not proper for the District Court to make in ruling on a summary judgment motion.  It cannot be denied that Plaintiffs offered evidence to dispute these findings.  Based on its own factfinding, the District Court resolved the question of "whether the Alabama Legislature . . . did, in fact, discriminate" by saying: "it did not."  <u>Id.</u> at 1277.

---

somewhat (Dr. Hood estimated that .87% of white, 1.44% of Black, and 1.26% of Hispanic registered voters lack photo ID)," but that Secretary Merrill "does not dispute that registered voters of color in Alabama are statistically more likely than white voters to lack the required photo ID."  <u>GBM (Dist. Ct.)</u>, 284 F. Supp. 3d at 1274.

Instead of correcting this error, the ruling on appeal simply seems to accept these judge-found facts. See GBM, 992 F.3d at 1322 (characterizing the fact that "minority voters in Alabama possess photo IDs at a slightly lower rate than white Alabama voters" as merely reflecting "small disparities").

This type of factfinding is not permissible on summary judgment review. Plaintiffs offered evidence showing that the photo ID law affects more than 118,000 voters. Id. at 1312 & n.25. It is undisputed that both parties' experts found statistically significant racial disparities in photo ID possession at the 95% confidence interval, with Black voters being approximately 1.65 to 1.78 times more likely than white voters to lack a qualifying photo ID, and Hispanic voters between 1.67 to 2.10 times more likely than white voters to face this problem. R. Doc. 234 ¶¶ 3–5 (statement of undisputed facts). And it is undisputed that at least 2,197 voters have had their provisional ballots rejected solely because they lacked a qualifying photo ID, with Black voters being 4.58 times more likely than white voters to have their ballots rejected. Id. ¶ 18.

The Supreme Court has found an even smaller numerical difference to be actionable: In Hunter v. Underwood, 471 U.S. 222, 105 S. Ct. 1916 (1985), the Court affirmed our Circuit's determination that the challenged disenfranchisement law had a racially disparate effect. Id. at 227, 105 S. Ct. at 1919–20. The fact that the statute at issue disfranchised only 606 registered voters in total, see Appellants'

Brief, Underwood v. Hunter, 730 F.2d 614 (11th Cir. 1984) (No. 82-7011), 1982 WL 1037553, at *7 (tables listing numbers of individual purged from voter rolls in both Montgomery and Jefferson Counties, Alabama), did not deter the Supreme Court. See also Stout ex rel. Stout v. Jefferson Cnty. Bd. of Educ., 882 F.3d 988, 992, 1002 (11th Cir. 2018) (affirming a discriminatory intent finding while repeating the district court's observation that the disparate impact "may seem insignificant" and involved changes of less than 2% (quotation marks omitted)); Frank, 819 F.3d at 386 ("The right to vote is personal and is not defeated by the fact that 99% of other people can secure the necessary credentials easily."); Williams v. City of Dothan, 818 F.2d 755, 764 (11th Cir. 1987) ("When considering disparate effect the focus should not be on absolute numbers . . . ."). The District Court here downplayed the disparities Plaintiffs presented when it weighed the evidence. Our Court should not have allowed this at the summary judgment stage.

And there was other conflicting evidence about the discriminatory effect of the photo ID law. For example, Plaintiffs also provided expert evidence that a disproportionate number of voters of color live more than five miles from a photo ID issuing office and lack access to a vehicle. See R. Doc. 252-16 ¶¶ 39–49. But again, and despite this expert opinion, the panel opinion says the "availability of mobile unit locations and home visits largely dispense with the need for

transportation."[9]  GBM, 992 F.3d at 1333.  Never mind that Plaintiffs also offered

evidence showing that the mobile ID unit made fewer than ten home visits, see id.

at 1344 (Gayles, J., dissenting) (noting also that one such visit occurred only

because a state legislator personally requested it), that the mobile ID units were

insufficiently dispersed to address transportation burdens, see R. Doc. 255 at 81–

82, and that few voters even knew about the mobile ID unit option, cf. id. at 88.[10]

It is not appropriate to resolve factual disputes at the summary judgment stage at

all - much less resolve them in favor of the movant as the panel opinion did here.

See Alves v. Bd. of Regents of the Univ. Sys. of Ga., 804 F.3d 1149, 1159 (11th

Cir. 2015) ("We do not weigh conflicting evidence or make credibility

determinations, and we draw all reasonable inferences arising from the undisputed

facts in favor of the nonmovant." (quotation marks omitted and alterations

adopted)); Layton, 686 F.3d at 1175 ("In reviewing a grant of summary judgment,

we resolve all ambiguities and draw reasonable factual inferences from the

evidence in the non-movant's favor.").

In sum, Plaintiffs presented evidence that creates genuine disputes of

material fact about discriminatory effect that should have been resolved at trial.

---

[9] The Alabama Secretary of State's "mobile unit" travels to a person's home to provide a photo ID if he or she lacks transportation.  GBM, 992 F.3d at 1309.

[10] While the parties present arguments about the significance of other factual disputes, I will not undertake to survey the remainder of the very lengthy record recounted (in part) in the District Court and panel opinions.

2. The majority erred in resolving factual disputes about discriminatory purpose in a light most favorable to the movant.

The District Court found it unnecessary to resolve the question of discriminatory purpose because it said that Secretary Merrill prevailed in showing there was no discriminatory effect. GBM (Dist. Ct.), 284 F. Supp. 3d at 1273–74. Again to its credit, the District Court acknowledged that it is "appropriate for the trier of fact to engage in the delicate and highly fact-sensitive consideration of the kinds of testimony and historical facts" at issue. Id. at 1273. The District Court's acknowledgment that intent is not a proper topic for resolution at the summary judgment phase is undoubtedly correct. See, e.g., Hunt v. Cromartie, 526 U.S. 541, 549, 552, 119 S. Ct. 1545, 1550, 1552 (1999) ("The legislature's motivation is itself a factual question. . . . [I]t was error in this case for the District Court to resolve the disputed fact of motivation at the summary judgment stage.").

On appeal, the panel opinion reached both questions of discriminatory result and purpose. This means our appeals court took the first, and only, pass at addressing the record on discriminatory purpose when it decided there was no dispute of material facts on this question. See GBM, 992 F.3d at 1322–27. But again here, weighing evidence and resolving conflicting testimony to ascertain intent is the duty of a factfinder, not a panel of an appeals court. And this is especially true where an appeals court takes on the job of the factfinder job in the first instance.

28

As the panel opinion recounted from the undisputed facts in the record, there have been concerted efforts in Alabama to pass a photo ID requirement for voters since the 1990s, and well before HB19 was successfully enacted as the photo ID law in this case. Id. at 1305. Alabama State Senator Larry Dixon was the chief sponsor of photo ID bills between 1995 and 2010.[11] Id. at 1306. Senator Dixon also made various comments about such efforts. In 1996, Senator Dixon stated, "the fact you don't have to show an ID is very beneficial to the black power structure and the rest of the Democrats." Id. In 2001, Senator Dixon said that voting without photo IDs "benefits black elected leaders, and that's why [black legislators are] opposed to it." Id. In 2010, in a meeting with several other legislators, another Alabama State Senator, Scott Beason, recorded Senator Dixon as saying: "Just keep in mind if [a pro-gambling] bill passes and we have a referendum in November, every black in this state will be bused to the polls. And that ain't gonna help. . . . Every black, every illiterate [will] be bused on HUD financed buses." Id. In another recorded meeting, Senator Beason himself referred to people who are black as "Aborigines." Id.

HB19 was pre-filed with the Alabama legislature on February 25, 2011. GBM, 992 F.3d at 1307. Alabama State Representative Kerry Rich was the House sponsor of HB19. Id. Representative Rich also made statements during a debate

---

[11] Senator Dixon retired in 2010. GBM, 992 F.3d at 1306.

29

over HB56, a bill that passed during the same legislative session as HB19 and within mere days of each other, that referred to certain Latinos as "illegals" and a "drain on the taxpayers." Id. at 1341 (Gayles, J., dissenting). Senator Beason—the one who used the term "Aborigines" to describe African Americans—was a co-sponsor of Senate Bill 86, the Senate's identical companion bill to HB19.[12] Id. at 1307. Five other Alabama state senators were present for these recorded conversations with retired Senator Dixon, and all of them sponsored or voted in favor of HB19. Compare id. at 1340–41 (Gayles, J., dissenting) (Senators Beason, Brooks, Glover, Sanford, and Waggoner present in the recorded conversation with Senator Dixon), with R. Doc. 255 at 41 (Senate sponsors of the photo ID law included Senators Beason, Brooks, Glover, Sanford, and Waggoner).

Plaintiffs offered this and other evidence to show that race may have played a role in the passage of HB19. This is enough to create a triable issue. See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265–66, 97 S. Ct. 555, 563 (1977) (holding that plaintiffs need show only that "a discriminatory

---

[12] Recall that Senator Beason also recorded Senator Dixon's comments about "every black, every illiterate" being "bused to the polls." In his own recording, Senator Beason responded to Senator Dixon by saying, "That's right. That's right. This will be busing extra." R. Doc. 255 at 41.

In February 2011, Senator Beason gave a speech in which he encouraged other lawmakers to "empty the clip, and do what has to be done" on immigration, because "when more illegal immigrants move into an area, when their children grow up and get the chance to vote, they vote for Democrats." GBM, 992 F.3d at 1341 (Gayles, J., dissenting).

purpose has been a motivating factor in the decision," because, after all, "[r]arely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one." (emphases added)). Despite the conflicting factual accounts of the passage of HB19 that became the photo ID law, the majority opinion again appears to assume the role of factfinder in deciding which facts are salient or persuasive, and which facts matter. See GBM, 992 F.3d at 1322–27. I've never understood the summary judgment standard to allow this approach.

I will offer just one more example of the competing facts in this case, and the resolution of the parties' disputes about statements made by state lawmakers. The panel discounted the idea that these lawmakers' statements suggested that race may have been a consideration in their actions, because the statements "were not made about the law at issue in this case and thus do not evidence discriminatory intent behind it." Id. at 1323. On this reasoning, the majority held that "[n]o reasonable fact-finder could find a discriminatory intent or purpose underlying Alabama's voter ID law from the statements identified by Plaintiffs." Id. at 1325.

Despite the panel approach, our Circuit has prior panel precedent addressing whether lawmaker statements may be considered only when they pertain precisely to the law at issue. In City of Carrollton Branch of the NAACP v. Stallings, 829

31

F.2d 1547 (11th Cir. 1987), this Court held that it was "of special significance" that the sponsor of the challenged voting legislation had, four years before, made a statement reflecting racial bias in support of a different voting bill. Id. at 1552. The Stallings court concluded "that there was evidence that the trial court should have considered in deciding whether there was an unconstitutional motivation in the mind of the introducer of the bill." Id. at 1553. However, the panel here made a number of observations distinguishing the facts of Stallings from this case. See GBM, 992 F.3d at 1323. For instance, the panel found it factually meaningful that Senator Dixon retired in 2010, before HB19's introduction, and says this weighs against any inference of discrimination. See id. Never mind that Senator Dixon repeatedly introduced photo ID bills during his tenure, and that this, of course, is a photo ID bill of the same ilk; that Senator Dixon expressed views reflecting a particular viewpoint about African-American voters at a meeting at which several lawmakers (who did, by the way, vote in favor of HB19) were present; and that Senator Beason, who was the Senate sponsor of the photo ID law, expressed agreement with Senator Dixon's views. See supra at 29–30 & n.12.

Plaintiffs also presented evidence of the historical background of HB19's passage, departures from the normal legislative procedural or substantive practice, and the foreseeability of disparate impact, among other things. See GBM, 992 F.3d at 1322–27. A full cataloguing of the competing facts that the majority

32

opinion resolved is beyond the scope of this dissent.  I will not attempt here to sift through and weigh every fact offered by the parties to support or negate discriminatory intent.  That role is for the factfinder, and should have been left for the factfinder here.  As the Supreme Court has observed, "[o]utright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence."  Hunt, 526 U.S. at 553, 119 S. Ct. at 1552.  As such, "[s]ummary judgment . . . is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact."[13]  Id.

The majority opinion misapplied the summary judgment standard.

*      *      *

"Voting is the beating heart of democracy."  Democratic Exec. Comm. of Fla. v. Lee, 915 F.3d 1312, 1315 (11th Cir. 2019).  It is a "fundamental political

---

[13] Much has been said about the fact-intensive inquiry behind assessing the existence of discriminatory purpose.  Perhaps it is simplest to recite the important observation the Fifth Circuit recently made:

> In this day and age we rarely have legislators announcing an intent to discriminate based upon race, whether in public speeches or private correspondence.  To require direct evidence of intent would essentially give legislatures free rein to racially discriminate so long as they do not overtly state discrimination as their purpose and so long as they proffer a seemingly neutral reason for their actions.  This approach would ignore the reality that neutral reasons can and do mask racial intent, a fact we have recognized in other contexts that allow for circumstantial evidence.

Veasey, 830 F.3d at 235–36 (footnote omitted); see also Hallmark Devs., Inc. v. Fulton County, 466 F.3d 1276, 1283 (11th Cir. 2006) ("Because explicit statements of racially discriminatory motivation are decreasing, circumstantial evidence must often be used to establish the requisite intent." (quotation marks omitted)).

right, because [it is] preservative of all rights." <u>Yick Wo v. Hopkins</u>, 118 U.S. 356, 370, 6 S. Ct. 1064, 1071 (1886). "It is beyond cavil that voting is of the most fundamental significance under our constitutional structure." <u>Burdick</u>, 504 U.S. at 433, 112 S. Ct. at 2063 (quotation marks omitted). These exhortations come to life only upon our faithful application of the law.

Because I believe the panel misapplied our precedent, I respectfully dissent from the denial of rehearing.